ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 31 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| MUKTA PATEL, on Behalf of Herself And All Others Similarly Situated, : | Case No.: **1:09-CV-3684**  CLASS ACTION |
| Plaintiff, : |  |
| v. : | **CAP** |
| R. C. PATEL, MUKESH C. PATEL, BRIG M. KAPOOL, MUKUND R. PATEL,: NARENDA D. PATEL, and DHIRU G. PATEL, : | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Defendants. : | DEMAND FOR JURY TRIAL |

Plaintiff, Mukta Patel ("Plaintiff"), individually and on behalf of all other

persons or entities that purchased and/or acquired the common stock ("stock") of

Haven Trust Bancorp, Inc. ("Haven Trust" or the "Company") between

December 31, 2006 and December 12, 2008, inclusive, alleges the following based

upon information and belief, except as to those allegations concerning herself,

which are based upon personal knowledge. Plaintiff's information and belief

allegations are based upon, among other things: (a) the investigation conducted by

and through her attorneys; (b) review and analysis of public statements, news

articles, and other publications disseminated by or concerning Haven Trust; (c)

review of information contained in the bankruptcy filings of Haven Trust; (d)

review of a report ("Report") prepared by the Federal Deposit Insurance Corp.

("FDIC") concerning the demise of Haven Trust's sole operating subsidiary; and

(e) other publicly available information about Haven Trust. Most of the facts

supporting the allegations contained herein are known only to the defendants or are

within their control. Plaintiff believes that substantial additional evidentiary

support will exist for the allegations set forth in this complaint (the "Complaint")

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased

or otherwise acquired the stock of Haven Trust between December 31, 2006 and

December 12, 2008 (the "Class Period"), against certain officers and/or directors of

Haven Trust ("Defendants"), for violations of the Securities Act of 1933 (the

"Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the

Georgia Securities Act of 1973 (as amended)[1] and Georgia common law.

---

[1]     The Georgia Securities Act of 1973 was repealed and replaced by the
Georgia Uniform Securities Act of 2008, effective July 1, 2009. The Georgia
Securities Act of 1973 governs the conduct of Defendants described herein prior to
July 1, 2009 and the Georgia Uniform Securities Act of 2008 governs the conduct
of Defendants thereafter.

2.    Haven Trust was the holding company for Haven Trust Bank (the "Bank"), a bank which used customers' deposits to finance loans it originated, principally commercial real estate (CRE) loans, and with a focus on acquisition, development, and construction and hotel/motel lending. The Bank's business was focused within the Asian-American and Indian community in the Atlanta area.

3.    On December 12, 2008, the Bank, the sole asset of Haven Trust, was seized and closed by the Georgia Department of Banking and Finance. The FDIC was appointed receiver of the Bank. On February 23, 2009, Haven Trust filed for Chapter 7 liquidation under the Bankruptcy Code in the Northern District of Georgia.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

5.    The claims alleged herein arise under Sections 12(a) and 15 of the Securities Act, 15 U.S.C. §§ 77-1(a) and 77(o), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

3

6.     Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District. Additionally, the Company's headquarters were in Duluth, Georgia, in this Judicial District, and Haven Trust is incorporated in Georgia.

7.     In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

8.     Plaintiff Mukta Patel purchased 4,000 shares of common stock of Haven Trust for $100,000 by certified check dated September 23, 2008 as described in the attached certification and has suffered economic harm as a result of the wrongful acts of defendants as alleged herein. She still retains these shares, which are now worthless.

4

9.     Defendant Mukesh G. "Mike" Patel was a founder and Chairman of the Board of Directors of Haven Trust and the Bank, according to several media reports, at relevant times.

10.     Defendant Rajesh "R. C." Patel was founder of Haven Trust according to media reports, and a member of the Board of Directors of Haven Trust and the Bank at relevant times.

11.     Defendants Brij M. Kapool, Mukund R. "Bobby" Patel, Narenda D. "Tony" Patel, and Dhiru G. "Danny" Patel were all members of Haven Trust's Board of Directors at relevant times and on information and belief also members of the Bank's Board of Directors at relevant times.

12.     Defendants Rajesh Patel and Mukesh Patel are brothers.    They are also cofounders of the Diplomat Hotel Corporation.    Plaintiff is not related to any of the Defendants.

13.     Non-party Haven Trust entered into Chapter 7 bankruptcy on February 23, 2009 (the "Bankruptcy").    It was a bank holding company with a single asset, the Bank.    The Bank was based in Duluth, Georgia, and had four branches in the Atlanta area and additional loan production offices in Birmingham, Alabama and Oklahoma City, Oklahoma.    It was founded on January 24, 2000, with an initial focus on business loans within the Asian-American and Indian

5

communities, especially to hotel and motel operators. The Bank's name was originally Horizon Bank and was changed to Haven Trust Bank in 2005. By 2008, it had approximately $575 million in assets. The Bank was placed in receivership with the Georgia Department of Banking and Finance on December 12, 2008 and subsequently taken over by Branch Banking & Trust, colloquially known as BB&T. Haven Trust and the Bank would be named Defendants in this action but for the Bankruptcy and receivership.

14. During the Class Period, each of the Defendants, as directors of Haven Trust and the Bank, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, were being concealed from and were misrepresented to the investing public.

15. It is appropriate to treat the Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information

6

conveyed to investors as alleged herein is the collective product of the narrowly defined group of Defendants identified above. Each of the above directors of Haven Trust, by virtue of his high-level position with the Company, was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Defendants were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal and state securities laws.

16.     As controlling persons of a company, the Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the investments in the Company's common stock would be based upon truthful and accurate information. The Defendants' omissions during the Class Period in connection with stock sales violated these specific requirements and obligations.

7

17. The Defendants, because of their positions of control and authority as directors of the Company, were able to and did control the content of the representations to investors made by Haven Trust.

18. The Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Haven Trust's stock by disseminating and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Haven Trust's business, operations, specifically the operations and conditions of the Bank and the intrinsic value of Haven Trust's stock; and (ii) caused Plaintiff and other members of the Class to purchase Haven Trust's stock at artificially inflated prices and suffer damages.

## **CLASS ALLEGATIONS**

19. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired the stock of Haven Trust during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

8

20. The members of the Class ("Class Members") are so numerous that joinder of all members is impracticable. Haven Trust's petition for Bankruptcy lists over 90 shareholders as of February 24, 2009. Record owners and other members of the Class may be identified from records maintained by the Bankruptcy Court and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

21. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

22. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class, securities and bank litigation.

23. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether the federal and state securities laws were violated by Defendants' acts as alleged herein;

9

b.     Whether the Defendants during the Class Period omitted to disclose to investors material facts about the business, performance and financial condition of Haven Trust and the Bank;

c.     Whether Defendants participated in and pursued the common course of conduct complained of herein;

d.     Whether Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts; and

e.     Whether the prices paid by Class Members for Haven Trust stock during the Class Period were artificially inflated due to the misrepresentations and omissions complained of herein.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

10

## FACTS

25.    In September 2008, Defendants R. C. Patel, Mukesh R. Patel, and Dhiru G. Patel solicited an investment in the stock of Haven Trust from Plaintiff and her husband. They described the investment as safe, and assured Plaintiff, and her husband that the Bank was financially sound and did not face any material or significant problems. Plaintiff in reliance on these representations, invested $100,000. The investment became essentially in a matter of months worthless after the Bank entered receivership and the Company entered Bankruptcy.

26.    On December 12, 2008, the FDIC and the Georgia Department of Banking and Finance announced that Haven Trust Bank had been closed by state regulatory action, with the FDIC appointed as receiver. On January 5, 2009, the FDIC notified the Office of Inspector General that at the time of closing, Haven Trust Bank had assets of $572 million and total deposits of $515 million. The FDIC estimated that the material loss to the Deposit Insurance Fund would be about $207 million. Branch Banking & Trust acquired the deposits and Haven Trust Bank's four branch offices for $112,000, and also acquired some other Bank assets. This drastic action was undertaken because the Bank had become non-viable.

11

27. Upon information and belief, all Defendants were directly or

indirectly soliciting numerous investors during the Class Period in the year 2008,

seeking to raise sufficient capital to forestall insolvency and this receivership. In

all instances, Defendants concealed the material facts enumerated below.

28. In August 2009, the Office of Inspector General of the Federal

Deposit Insurance Corporation completed a "Material Loss Review of Haven Trust

Bank," as it is required to do by Section 38(k) of the Federal Deposit Insurance

Act, 12 U.S.C. §1831(k). This Report is attached to this Complaint.

29. The Report described the history of the Bank, and the factors that led

to its insolvency and receivership. It concluded that the Defendants, in their

capacity as directors, were the cause of the bank failure:

> The key cause of failure of the institution was that its BOD [Board of Directors] did not adequately identify, measure, monitor, and control risk in its loan portfolio. Bank management pursued an aggressive loan growth strategy concentrated in high-risk CRE [Commercial Real Estate] construction and development loans with poor loan underwriting and funded by high-cost deposits and borrowings. Because the majority of CRE in the bank's portfolio was originated with weak underwriting, such as little or no borrower equity in the project, much of the risk associated with the loan portfolio tended to rest with the bank rather than the borrower. As a result, the combination of the concentration of CRE and poor underwriting made the bank vulnerable to fluctuations in the real estate market, and when that market declined, the bank's loan portfolio became significantly impaired. By and large, bank management ignored the increasing

12

risks of the bank's loan originations and failed to address examiner concerns or take appropriate steps to manage those risks.

30.     The Report noted that the Bank grew at an average growth rate of over 40 percent per year between 2001 and 2008, with all of the growth in higher-risk CRE and Acquisition, Development and Construction ("ADC") lending. The Defendants made no efforts to diversify the areas of lending, resulting in extraordinary concentrations of risk, in violation of the Interagency Guidance on Concentrations in Commercial Real Estate Lending published jointly by the FDIC and several other bank regulatory agencies in 2006 ("Interagency Guidance").

31.     The Bank's cost of funds was also substantially higher than that of peer group banks.

32.     The Bank's loan policies were completely inadequate for the risk profile of its lending. The Bank lacked, or failed to follow, sound or advisable limits for specific categories of lending; allowed the use of interest reserves for initial construction by ADC borrowers; failed to require minimum equity investments in projects it financed for commercial borrowers; and exceeded all sound and advisable limits on speculative development and construction loans. In fact, Haven Bank never developed a lending policy incorporating any of the credit underwriting standards detailed in the Interagency Guidance.

13

33.    One example of improper practices at the Bank highlighted by the

FDIC was the extension of four loans for $2 million each to four adult children of

one of Haven Trust's founders. The loans were purportedly secured by stock in

another company, but the Bank had not obtained stock certificates, and the value of

the stock could not be determined. Moreover, the borrowers were students without

the ability to repay the loan. This was apparently a disguised loan to the children's

father, who was heavily leveraged. Although the father had a questionable ability

to repay the loan, there was no obligation to do so pursuant to a guarantee or other

agreement with the Bank.

34.    The statements made to Plaintiff and her husband, and to other Class

Members at the times of their investments in Haven Trust, were materially

misleading because they omitted to disclose these highly relevant facts. Had

proper disclosures been made, Plaintiff and other Class Members would not have

invested in Haven Trust stock.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF
### § 12(A)(2) OF THE SECURITIES ACT

35.    Plaintiff repeats and realleges each and every allegation contained

above as it fully set forth herein except those alleging fraud.

14

36.     This count is brought pursuant to § 12(a)(2) of the Securities Act, against all Defendants.

37.     For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

38.     Defendants and Haven Trust, were offerors, and/or of sales of the securities offered to Class Members, which omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth above.

39.     Plaintiff and other members of the Class who acquired Haven Trust stock have sustained damages as a result of omissions for which they hereby elect to rescind and tender their Haven Trust stock in return for the consideration paid for the Haven Trust stock with interest.

40.     Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based, which facts first became fully known upon publication of the Report in August 2009, to the time of filing of this action. Less than three years have elapsed from the time that Haven Trust stock was offered *bona fide* to the Class Members to the time of filing of this action.

41.     By virtue of the foregoing, Defendants and Haven Trust violated § 12(a)(2) of the Securities Act.

## COUNT II

### AGAINST THE DEFENDANTS FOR VIOLATIONS OF § 15 OF THE SECURITIES ACT

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except those alleging fraud.

43.     This count is brought pursuant to § 15 of the Securities Act against all Defendants.

44.     For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

45.     The Defendants were control persons of Haven Trust by virtue of their directorial positions at the Company. The Defendants had the power, and exercised the same, to cause Haven Trust to engage in the violations of law complained of herein and were able to and did control the contents of the statements made to Plaintiff and other Class Members respecting investments in Haven Trust stock.

46. By reason of their positions as directors of Haven Trust and their actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over any securities offering materials and other statements made to secure investors, the Defendants are jointly and severally liable to Plaintiff and the other members of the Class as a result of the wrongful conduct alleged herein.

## COUNT III

### VIOLATION OF THE GEORGIA SECURITIES ACT OF 1973 AGAINST ALL DEFENDANTS

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. This count is brought under the doctrine of supplemental jurisdiction to enforce liability created by O.C.G.A. § 10-5-12 of the Georgia Securities Act of 1973.

49. O.C.G.A. § 10-5-12(a) of the Georgia Securities Act of 1973 makes it unlawful, in connection with the offer, purchase, or sale of a security to make a material omission.

50. Each Defendant, as previously outlined, made one or more material omissions with respect to the sale of securities to the Plaintiff and other members

17

of the Class. As a result, each Class Member suffered great economic harm as a consequence of Defendants' actions.

51.     O.C.G.A. § 10-5-14(c) makes each Defendant liable as a "control person" because each Defendant was an "executive officer or director" of Haven Trust at the time the material omissions occurred. The Defendants' violations of the Georgia Securities Act of 1973 not only caused the Plaintiff to purchase the securities, those violations also caused the Plaintiff and other members of the Class to lose large sums of money.

52.     This action is brought within the time permitted by law.

**COUNT IV**

**CLAIMS FOR RECISSION FOR
VIOLATIONS OF GEORGIA SECURITIES ACT**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This count is brought under the doctrine of supplemental jurisdiction to enforce liability created by O.C.G.A. § 10-5-12 and O.C.G.A. § 10-5-14 of the Georgia Securities Act of 1973.

55.     The offer to sell investments in Haven Trust by Defendants and the purchase of same by Plaintiff and other members of the Class constitute the offer

and sale of securities within the meaning of the Georgia Securities Act of 1973,
O.C.G.A. § 10-5-12, et seq.

56.     At all times relevant to this action, Defendants had knowledge of, or
reasonable grounds to believe the existence of facts by reason of which their
liability under this Count is alleged to exist, and with this knowledge, Defendants
made material omissions of fact with respect to the offer and sale of securities.

57.     The foregoing material omissions by Defendants constitute violations
of O.C.G.A. § 10-5-12 of the Georgia Securities Act of 1973, and the Defendants
are jointly and severally liable to each Class Member for each transaction
involving the investments in which they participated pursuant to O.C.G.A. § 10-5-
14 of the Georgia Securities Act of 1973.

58.     Plaintiff and other members of the Class are each entitled to complete
rescission of their respective purchases and to a return of their entire investment,
and any other damages to be proved at trial, plus interest from the date of each
investment, and their costs and expenses, including reasonable attorney's fees.

59.     This action is brought within the time permitted by law.

19

## COUNT V

## NEGLIGENT MISREPRESENTATION AND OMISSION

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is brought under the doctrine of supplemental jurisdiction to enforce liability created under Georgia law.

62.     As set forth above, Defendants breached their legal duty to provide accurate information to each Class Member as prospective purchasers of investments in Haven Trust by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in Haven Trust.

64.     By reason of the aforesaid, Defendants are liable, jointly and severally, for negligence to each Class Member pursuant to applicable Georgia law, including without limitation, O.C.G.A. §§ 51-1-6 and 51-1-8, for the full price paid for shares purchased by Plaintiff and other members of the Class with interest thereon from the date of payments, and all other damages allowed by law.

20

65.    This action is brought within the time permitted by law.

## DEFENDANTS' CONCEALMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO HAVEN TRUST'S INVESTORS

66.    Defendants' omissions of material information in connection with the sale of shares continued throughout the Class Period until the FDIC took over the Bank.

67.    Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for Haven Trust stock. Plaintiff and the Class would not have purchased Haven Trust stock at the artificially inflated prices which they paid.

68.    Class Members' damages were proximately caused by the failure of Haven Trust Bank, which the Report attributes to malfeasance by the Defendants, and by the same underlying facts that constitute the material omissions constituting the basis of this Complaint, including the Bank's very heavy concentration in especially risky ADC loans; weak underwriting standards, such as the failure to require some borrower equity in the financed projects; overreliance by Defendants on equity investments by Class Members to prop up the capital of the Bank; and the use of high cost non-core deposits, often brokered to the Bank at high commissions cost with no attendant capital benefit to the Bank.

21

## FACTS WHICH GIVE RISE TO A STRONG
## INFERENCE OF SCIENTER

69.     Significantly for this case, the Defendants were fully aware of the

Bank's very significant deficiencies because they had received repeated comments

from federal and state bank examiners who alternated doing safety and soundness

examinations.  Between 2002 and January 2008, the Bank was examined five times

by either the FDIC or the Georgia Department of Banking and Finance.  Each

examination culminated with recommendations to the Bank, which were provided

to the Defendants, but were not publicly available to investors.

70.     Defendants knew and/or recklessly disregarded the falsity and

misleading nature of the information that they caused to be disseminated to the

investing public.  The ongoing fraudulent scheme described in this Complaint

could not have been perpetrated over a substantial period of time, as has occurred,

without the knowledge and complicity of the personnel at the highest level of the

Company, including the Defendants.

71.     In particular, a compelling inference of scienter arises from the

following facts.  Haven Trust Bank was the subject of bank examinations by the

FDIC in December 2002, June 2005 and January 2008, and the subject of bank

examinations by the Georgia Department of Banking and Finance in March 2004

and August 2006. Each of these examinations led to the communication of recommendations and comments to the Bank and its sole shareholder, Haven Trust, and all directors thereof. Thus, these findings were known to the Defendants. The Bank's failure to respond appropriately to the recommendations was also known to Defendants, who had a fiduciary responsibility to assure compliance by the Bank with all applicable laws and regulations.

72. A summary of the recommendations appears at page 9 of the Report, attached hereto. The regulators' findings of violations of law and regulations were pervasive, encompassing an enormous breadth of the operations of the Bank. Violations of the Bank Secrecy Act and of insider and affiliated transaction regulations were found in 2002, 2004, 2006, and 2008; violations relating to loan underwriting or credit administration were found in 2005, 2006, and 2008; and inadequate loan or loan underwriting policies were found in 2005, 2006, and 2008.

73. The Bank's poor loan underwriting and lack of risk management controls combined with loans concentrated in high-risk CRE construction and development lending which were identified by the regulators made the Bank particularly vulnerable to any downturn in the real estate market. As the real estate market commenced its downturn prior to the commencement of and throughout the

23

Class Period, Defendants knew or recklessly disregarded the significant

impairment of the Bank's loan portfolio.

74. The January 2008 examination by the FDIC raised especially great

concerns in these areas. Following this examination however Defendants largely

ignored examiner recommendations and continued to grow the real estate loan

portfolio. In August 2008, the FDIC informed the Bank that it could no longer

accept, renew or rollover brokered deposits absent a waiver from the FDIC. To

address the ongoing violations of laws and regulations, inadequate risk

management controls, and other safety and soundness issues which went

uncorrected, the Bank was forced to enter into a Memorandum of Understanding

with the FDIC, in which it agreed to change its riskiest practices in September

2008. Another examination of the Bank was commenced by the Georgia

Department of Banking and Finance in September 2008 and found significant

deterioration in the Bank's condition and determined that there were critical

deficiencies in all six components that regulators use to evaluate a bank's

performance: capital asset, asset quality, earnings performance, liquidity position

and sensibility to market risk (referred to as "CAMELS"). Each component, and

an overall composite score, is assigned a rating of 1 through 5, with 1 having the

lowest regulatory concern and 5 having the greatest concern. The FDIC had

assigned the Bank a 3 CAMELS rating in January 2008, and the Georgia

Department of Banking and Finance was preparing to issue a further downgrade in

conjunction with its September 2008 examination. All of this information was

known to Defendants but concealed from Plaintiff and Other Class Members.

75.     On December 10, 2008, a resolution was passed by Defendants to turn

the Bank over to receivership.

## COUNT VI

## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

76.     Plaintiff repeats and realleges each and every allegation contained

above as if fully set forth herein.

77.     During the Class Period, Defendants carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and other Class members, as

alleged herein to the true condition of the Bank; and (ii) cause Plaintiff and other

members of the Class to purchase Haven Trust stock at artificially inflated prices.

In furtherance of this unlawful scheme, plan and course of conduct, Defendants,

and each of them, took the actions set forth herein.

25

78.    Defendants (a) employed devices, schemes, and artifices to defraud;
(b) made untrue statements of material fact and/or omitted to state material facts
necessary to make the statements not misleading; and (c) engaged in acts,
practices, and a course of business which operated as a fraud and deceit upon the
purchasers of Haven Trust's stock in an effort to maintain artificially high market
prices for those securities in violation of Section 10(b) of the Exchange Act and
Rule 10b-5. All Defendants are sued as primary participants in the wrongful and
illegal conduct charged herein and as controlling persons, as alleged below.

79.    Defendants, individually and in concert, directly and indirectly, by the
use, means or instrumentalities of interstate commerce and/or of the mails, engaged
and participated in a continuous course of conduct to conceal adverse material
information about the business, operations and future prospects of Haven Trust as
specified herein.

80.    Defendants employed devices, schemes and artifices to defraud, while
in possession of material adverse non-public information and engaged in acts,
practices, and a course of conduct as alleged herein in an effort to assure investors
of Haven Trust's sound financial position, despite the challenging market
conditions, which included the making of, or the participation in the making of,
untrue statements of material facts and omitting to state material facts necessary in

order to make the statements made about Haven Trust and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Haven Trust stock during the Class Period.

81. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Defendants were directors of Haven Trust during the Class Period; (ii) each of these Defendants, by virtue of his responsibilities and activities as a director of the Company, was privy to and participated in the creation, development and reporting of Haven Trust's plans, statements and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to members of the Bank's management team, examinations, internal reports and other data and information about the Haven Trust's operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

82. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the

27

truth in that they failed to ascertain and to disclose such facts, even though such

facts were available to them. Such material omissions were done knowingly or

recklessly and for the purpose and effect of concealing Haven Trust's financial

condition and future business prospects from the investing public and supporting

the artificially inflated price of its securities. As demonstrated by Defendants'

non-disclosure of Haven Trust's business and operations throughout the Class

Period, Defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover

whether those statements were false or misleading.

83.    As a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the price of

Haven Trust stock was artificially inflated during the Class Period.

84.    At the time of said omissions, Plaintiff and other members of the

Class were ignorant of the true financial condition of Haven Trust. Had Plaintiff

and the other members of the Class known the truth regarding Haven Trust's

financial condition, the riskiness of its loans, and its critically unsound business

practices which facts were not disclosed by Defendants, Plaintiff and other

members of the Class would not have purchased or otherwise acquired their Haven

28

Trust stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

85.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Haven Trust's stock during the Class Period.

## COUNT VII

## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     The Defendants acted as controlling persons of Haven Trust and the Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company and participation in and/or awareness of the Company's operations, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The

29

Defendants were provided with or had unlimited access to information about Haven Trust's and the Bank's financial condition, its loan origination practices, the low credit quality of its loans, the high percentage of high cost non-core deposits and its communications with regulators, and copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90. As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, of Haven Trust and the Bank, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Haven Trust's stock during the Class Period.

30

## COUNT VIII

## CLAIMS FOR DAMAGES FOR
## GEORGIA SECURITIES LAW VIOLATIONS

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.    This Count is brought under the doctrine of supplemental jurisdiction to enforce liability created by O.C.G.A. § 10-5-12 and O.C.G.A. § 10-5-14 the Georgia Securities Act of 1973.

93.    Defendants offered to sell and sold securities to Plaintiffs herein.

94.    In connection with the offer to sell and the sale of these securities, Defendants knew that they had made material omissions to each Class Member with the specific intent and purpose to effectuate a device and scheme and artifice to defraud each Class Member.

95.    In the alternative, Defendants' acts were reckless and operated to deceive and defraud each Class Member.

96.    Each Class Member was justified in reasonably relying upon the representation of Defendants.

97.    Defendants' course of conduct as described above operated as a fraud upon each Class Member.

31

98.    As a result of Defendants' acts and omissions as described above,

Defendants obtained monies belonging to each Class Member by means of the

omission of material facts necessary for Plaintiff and other Class Members to make

informed decisions with respect to the purchase of the securities.

99.    Defendants have engaged in transactions, practices and courses of

business, as described above, which operated to defraud and deceive each Class

Member as a purchaser of the securities.

100.   As a result of the violations cited herein, each Class Member has

suffered damages and is entitled to recover from Defendants the consideration paid

for their investments, plus lawful interest, reasonable attorney's fees and costs, and

other damages as permitted by law.

## COUNT IX

### CLAIMS FOR DAMAGES FOR
### GEORGIA SECURITIES LAW VIOLATIONS

101.   Plaintiff repeats and realleges each and every allegation contained

above as if fully set forth herein.

102.   This Count is brought under the doctrine of supplemental jurisdiction

for violations of the fraud provisions of Georgia law.

32

103. The foregoing material omissions by the Defendants constitute fraud actionable at common law and under other provisions of Georgia law including, without limitation, O.C.G.A. §§ 51-6-1, 23-2-52, 23-2-53, 23-2-60, and 13-4-60.

104. Plaintiffs are also each entitled to recover separate punitive damages in amounts to be proved at trial. All Defendants are jointly and severally liable for any and all amounts owing to each Class Member for each investment made by each Class Member.

105. This action is brought within the time permitted by law.

## COUNT X

## GEORGIA STATUTORY FRAUD

106. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107. This Count is brought under the doctrine of supplemental jurisdiction for violations of the fraud provisions of Georgia Law.

108. The foregoing material omissions by the Defendants constitute fraud actionable at common law and under other provisions of Georgia law including, without limitation, O.C.G.A. §§ 51-6-1, 23-2-52, 23-2-53, 23-2-60, and 13-4-60.

109. Plaintiff and the other Class Members are also each entitled to recover separate punitive damages in amounts to be proved at trial. All Defendants are

33

jointly and severally liable for any and all amounts owing to each Class Member

for each investment made by each Class Member.

110.   This action is brought within the time permitted by law.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying

Plaintiff as class representative under Rule 23 of the Federal Rules of Civil

Procedure;

B.     Awarding compensatory, punitive and other damages to the full extent

permitted by law in favor of Plaintiff and the other Class Members against all

Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest

thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

34

Respectfully submitted, this 30th day of December, 2009.

GORBY PETERS & ASSOCIATES, LLC

/s/ Michael J. Gorby, Esq.
Michael J. Gorby, Esq.
mgorby@gorbypeters.com
(Georgia Bar No. 301950)
Two Ravina Drive, Suite 1500
Atlanta, Georgia 30346-2106
Telephone:  (404) 239-1150
Fax:  (404) 239-1179

Lawrence J. Lederer
Robin Switzenbaum
Arthur Stock
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email: llederer@bm.net
          rswitzenbaum@bm.net
          astock@bm.net

*Attorneys for Plaintiff Mukta Patel*

35

**HAVEN TRUST BANCORP, INC.**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS**

Mukta Patel ("Plaintiff"), hereby duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the draft complaint against and certain of the officers and directors of Haven Trust Bancorp, Inc., approves of its contents, and authorizes her selected counsel, Gorby, Peters & Associates, P.C., and Barger & Montague, P.C., to represent her in this action, including filing a complaint and a lead plaintiff petition on her behalf.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of his counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in the security that is the subject of the complaint during the class period alleged in the complaint are as follows:

| Number of Shares of Common Stock Purchased | Date of Purchase/Sale | Price per Share |
|---|---|---|
| 4,000 | September 23, 2008 | $25 |

5.    Plaintiff has not sought to serve or served as a representative party on behalf of a class under the United States federal securities laws during the three (3) years preceding the date on which this certification is signed.

6.    Plaintiff has not accepted and will not accept any payment for serving as representative party on behalf of the class beyond her *pro rata* share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28day of December, 20 09

By: _Mukta M. Patel_
    Mukta Patel

PSLRA Cert

# Office of
# Inspector General

**August 2009**
**Report No. AUD-09-017**

## Material Loss Review of Haven Trust Bank, Duluth, Georgia

### AUDIT REPORT



*Office of Audits*





*Office of Audits*

**OIG**

**Federal Deposit Insurance Corporation**

**Report No. AUD-09-017**                                                            **August 2009**

# Material Loss Review of Haven Trust Bank, Duluth, Georgia

## Why We Did The Audit

On December 12, 2008, the Georgia Department of Banking closed Haven Trust Bank (Haven) of Duluth, Georgia, and named the FDIC as receiver. On January 5, 2009, the FDIC formally notified the Office of Inspector General (OIG) that the estimated loss to the Deposit Insurance Fund (DIF) due to this failure was $207 million. As required by section 38(k) of the Federal Deposit Insurance (FDI) Act, the OIG conducted a material loss review of the failure of Haven.

The audit objectives were to (1) determine the causes of the financial institution's failure and resulting material loss to the DIF and (2) evaluate the FDIC's supervision of the institution, including implementation of the Prompt Corrective Action (PCA) provisions of section 38, of the FDI Act.

## Background

Haven Trust was a state-chartered, non-member institution that was established on January 24, 2000 and headquartered in Duluth, Georgia. The bank operated four branches in the Atlanta area and loan production offices in Birmingham, Alabama, and Oklahoma City, Oklahoma. The bank was part of a chain banking group that also controlled two other FDIC-insured banks in Georgia and Florida. From its inception, Haven grew at a rapid pace, from $29 million in assets in its first year of operation in 2000, to approximately $550 million by 2007. This growth was predicated upon the use of non-core deposits and borrowings to fund risky acquisition, development, and construction (ADC) loans and other types of risky commercial real estate (CRE) loans.

Haven had been rated a composite 2 at all examinations from 2002 until January 2008, when asset quality deterioration was identified in the FDIC examination. This resulted in the bank being rated a composite 3, and the bank was placed under a Memorandum of Understanding (MOU). Key provisions of the MOU included developing: (1) an effective underwriting and credit administration program, (2) a capital plan, and (3) a liquidity contingency plan. At a September 2008 examination, Georgia banking officials found significant deterioration of the bank's condition and deemed the bank not viable.

## Audit Results

**Causes of Failure and Material Loss -** Haven failed due to bank management's lack of oversight and failure to control risk in its loan portfolio. The key events leading to the failure of the institution included rapid loan growth concentrated in high-risk CRE construction and development loans. Combined with poor loan underwriting and a lack of risk management controls, these concentrations made the bank vulnerable to fluctuations in the real estate market, and when the metropolitan Atlanta real estate market began declining, the bank's loan portfolio became significantly impaired. Haven's management largely ignored the increasing risks of the bank's loan concentrations and did not fully address examiner concerns and recommendations. Subsequent to the January 2008 FDIC examination, bank management engaged in a number of improper practices, including renewing loans that were experiencing problems and originating loans that appeared to be for the benefit of insiders and related parties, despite warnings from examiners to control risk in the lending area.

As of December 31, 2007, CRE loans totaled 781 percent of Tier 1 Capital, 451 percent of which represented ADC loans. Despite these significant loan concentrations, the bank's loan policy did not contain any internal limits on speculative construction loans or provide specific procedures for monitoring CRE concentrations. Further, there was no guidance in the policy governing interest reserves, which led to their inappropriate use. Haven's loan underwriting and administration deficiencies included: (1) loan-to-value ratios in excess of interagency guidelines, (2) using incomplete or outdated financial information to assess a borrower's ability to repay, (3) lending with low-or-no-borrower equity in a project, and (4) poorly managed credit files. Moreover, Haven's significantly higher cost of funds - typically 100 to 150 basis points higher than the cost of funds for banks in its peer group - necessitated riskier lending in order to attain profitability. Haven's loan losses resulted in capital and liquidity problems and ultimately led to its failure and a material loss to the DIF.

**Assessment of FDIC Supervision and Implementation of PCA -** The FDIC's supervision of Haven was not effective in identifying and addressing problems early enough to prevent a material loss to the DIF. Although the FDIC and the state conducted regular examinations of Haven, the bank's high-risk profile warranted earlier and greater attention. Reports of Examination (ROE), from the bank's inception, noted a pattern of improper insider dealings along with rapid growth concentrated in risky assets, funded by high-cost non-core deposits. However, the high apparent earnings and high apparent capital levels and an overreliance by regulators on bank ownership to infuse capital when needed, combined to delay effective supervisory actions. Specific areas in which supervision could have been more proactive include the bank's inappropriate use of interest reserves, questionable loan participation practices, and analysis of the allowance for loan and lease losses. When the January 2008 ROE noted deterioration in the financial condition of the bank, its composite rating was lowered to a 3, and the bank was placed under an MOU in September 2008. In August 2008, the FDIC appropriately notified the bank, that in accordance with PCA provisions, it could no longer accept brokered deposits without an FDIC waiver. However, by the time supervisory actions were taken against the bank, failure was all but inevitable. The FDIC has authority to take a wide range of supervisory actions; however, in the case of Haven, supervisory actions were not timely and effective in addressing the bank's most significant problems. The findings in our review underscore one of the more difficult challenges facing regulators today - limiting risk assumed by banks when their profits and capital ratios make them appear financially strong.

The FDIC OIG plans to issue a series of summary reports on our observations on the major causes, trends, and common characteristics of financial institution failures resulting in a material loss to the DIF. Recommendations in the summary reports will address the FDIC's supervision of the institutions, including implementation of the PCA provisions of section 38.

## Management Response

On July 31, 2009, the Division of Supervision and Consumer Protection (DSC) provided a written response to the draft report. DSC agreed that, despite Haven's apparently strong financial condition, earlier enforcement actions and management component rating downgrades could have been used to address persistent risk management weaknesses.

## *Contents*

*Page*

BACKGROUND                                                                    2

CAUSES OF FAILURE AND MATERIAL LOSS                                           4
  **Ineffective Board of Directors**                                          5
    **Rapid Growth Strategy**                                                 5
    **Loan Policies**                                                         7
    **Implementation of Examiner Recommendations**                           9
    **Laws and Regulations**                                                  10
  **Underwriting and Credit Administration**                                  11
    **LTV Guidelines**                                                        11
    **Borrowers' Ability to Repay**                                           12
    **Credit Administration**                                                 13
    **Participations Bought and Sold**                                        13
    **Use of Interest Reserves**                                              14
  **Examples of Underwriting and Credit Administration Deficiencies**         14
    **ADC Loan – Retail Shopping Center**                                     14
    **ADC Loan – Acreage Redevelopment**                                      15
    **Loans to Purchase Investment Property**                                 16
    **Loan for a Speculative Townhouse Development**                          16

ASSESSMENT OF FDIC SUPERVISION                                               17
  **Repeat Concerns from Recent Examinations**                               18
  **Following up on Red Flags**                                              19
  **Risk Identification and Analysis**                                       20

IMPLEMENTATION OF PCA                                                        21

CORPORATION COMMENTS AND OIG EVALUATION                                      22

APPENDICES
  **1. OBJECTIVES, SCOPE, AND METHODOLOGY**                                  23
  **2. GLOSSARY OF TERMS**                                                   26
  **3. HAVEN'S COMPLIANCE WITH ENFORCEMENT ACTION**                         27
  **4. CORPORATION COMMENTS**                                               28
  **5. ACRONYMS IN THE REPORT**                                             29

TABLES
  **1. Financial Institution Snapshot**                                      3
  **2. Haven's Examination History**                                         4
  **3. Haven's Non-Core Funding Sources**                                    7
  **4. Examples of Examiner Comments and Recommendations Regarding**         9
     **Haven's  Management**
  **5. Supervisory LTV Limits**                                             12

FIGURES
  **1. Haven's Return on Assets Compared to Peer Group**                     3
  **2. Total Assets**                                                        5
  **3. ADC Loans as a Percentage of Total Capital – Compared to Peer**       6
  **4. Property Related to a Loan**                                         17



**Federal Deposit Insurance Corporation**
3501 Fairfax Drive, Arlington, VA 22226

Office of Audits
Office of Inspector General

| | |
|---|---|
| **DATE:** | August 5, 2009 |
| **MEMORANDUM TO:** | Sandra L. Thompson, Director<br>Division of Supervision and Consumer Protection |
| **FROM:** | /Signed/<br>Russell A. Rau<br>Assistant Inspector General for Audits |
| **SUBJECT:** | *Material Loss Review of Haven Trust Bank, Duluth,*<br>*Georgia* (Report No. AUD-09-017) |

As required by section 38(k) of the Federal Deposit Insurance Act (FDI Act), the Office of Inspector General (OIG) conducted a material loss[1] review of the failure of Haven Trust Bank (Haven), Duluth, Georgia. On December 12, 2008, the Georgia Department of Banking and Finance (DBF) closed the institution and named the FDIC as receiver. On January 5, 2009, the FDIC notified the OIG that Haven's total assets at closing were $575.5 million and the material loss to the Deposit Insurance Fund (DIF) was $207 million.

When the DIF incurs a material loss with respect to an insured depository institution for which the FDIC is appointed receiver, the FDI Act states that the Inspector General of the appropriate federal banking agency shall make a written report to that agency which reviews the agency's supervision of the institution, including the agency's implementation of FDI Act section 38, *Prompt Corrective Action* (PCA); ascertains why the institution's problems resulted in a material loss to the DIF; and makes recommendations to prevent future losses.

The audit objectives were to: (1) determine the causes of the financial institution's failure and resulting material loss to the DIF and (2) evaluate the FDIC's supervision[2] of the institution, including implementation of the PCA provisions of section 38 of the FDI Act. Appendix 1 contains details on our objectives, scope, and methodology. Appendix 2 contains a glossary of terms. Acronyms used in the report are listed in Appendix 5.

---

[1] As defined by section 38(k)(2)(B) of the FDI Act, a loss is material if it exceeds the greater of $25 million or 2 percent of an institution's total assets at the time the FDIC was appointed receiver.

[2] The FDIC's supervision program promotes the safety and soundness of FDIC-supervised institutions, protects consumers' rights, and promotes community investment initiatives by FDIC-supervised insured depository institutions. The FDIC's Division of Supervision and Consumer Protection (DSC) (1) performs examinations of FDIC-supervised institutions to assess their overall financial condition, management policies and practices, including internal control systems; and compliance with applicable laws and regulations; and (2) issues related guidance to institutions and examiners.

This report presents the FDIC OIG's analysis of Haven's failure and the FDIC's efforts to ensure Haven's management operated the bank in a safe and sound manner. The FDIC OIG plans to issue a series of summary reports on our observations on the major causes, trends, and common characteristics of financial institution failures resulting in a material loss to the DIF. Recommendations in the summary reports will address the FDIC's supervision of the institutions, including implementation of the PCA provisions of section 38.

## BACKGROUND

Haven was a state-chartered, non-member bank that was established on January 24, 2000[3] and headquartered in Duluth, Georgia. In its nearly 9-year history, the bank:

- Operated four branches in the Atlanta area and loan production offices in Birmingham, Alabama, and Oklahoma City, Oklahoma.

- Was a wholly-owned subsidiary of Haven Trust Bancorp, Inc. (HTB), which was a shell holding company that provided no services to the bank. HTB was also affiliated with two other banks through common ownership and common directorate. HTB's chairman of the board of directors (BOD) was also the chairman of the BOD of the two other banks located in Georgia and Florida.

- Was considered a minority-owned bank and served both the Indian and Asian-American communities around the area. Haven also was a preferred Small Business Administration lender.

- Concentrated its loan portfolio in commercial real estate (CRE) with a focus in acquisition, development, and construction (ADC) and hotel/motel lending.

From its inception, Haven grew at a rapid pace, from $29 million in assets in its first year of operation in 2000, to approximately $575 million by 2008. This rapid growth was predicated in part on the use of non-core funding, including brokered deposits, to fund risky ADC loans and other types of CRE lending. This strategy appeared to work prior to 2007 (see Figure 1) when the Atlanta real estate market was performing well and Haven's return on assets compared favorably to its peers.

---

[3] The bank's name was originally Horizon Bank and was changed to Haven in 2005.



Source: Uniform Bank Performance Reports (UBPR).

However, soon after the Atlanta real estate market began experiencing problems, Haven's return on assets plummeted due, in part, to bank management having positioned the bank to be dependent on that market. Other aspects of Haven's financial condition, as of September 2008, and for the 4 preceding calendar years follow in Table 1.

**Table 1: Financial Institution Snapshot**

|  | 30-Sept-08 | 31-Dec-07 | 31-Dec-06 | 31-Dec-05 | 31-Dec-04 |
|---|---|---|---|---|---|
| Total Assets ($000s) | $559,551 | $504,306 | $372,588 | $269,127 | $175,346 |
| Total Deposits ($000) | $489,692 | $426,482 | $317,245 | $218,883 | $141,394 |
| Total Loans ($000s) | $476,408 | $420,829 | $312,124 | $221,568 | $148,847 |
| *Net Loan Growth Rate* | 28.09% | 35.07% | 41.04% | 48.68% | 46.26% |
| Tier 1 Leverage Capital Ratio | 4.42% | 8.09% | 9.58% | 8.98% | 9.53% |
| Net Income (Loss) ($000s) | ($13,647) | $5,574 | $7,492 | $3,874 | $1,892 |
| Return on Assets | -3.50% | 1.42% | 2.53% | 1.76% | 1.32% |
| **Loan Mix as a Percentage of Average Gross Loans:** |  |  |  |  |  |
| All Loans Secured by Real Estate | **82.30%** | **75.00%** | **73.52%** | **78.09%** | **77.81%** |
| Construction and Development | 35.62% | 46.24% | 50.35% | 62.11% | 63.38% |
| CRE - Non-farm/nonresidential | 30.28% | 3.84% | 2.88% | 2.14% | 4.26% |
| Other | 16.40% | 24.91% | 20.29% | 13.83% | 10.17% |
| Commercial & Industrial Loans | 16.02% | 23.47% | 24.72% | 19.69% | 19.52% |
| **Funding:** |  |  |  |  |  |
| Net Loans/Deposits | 95.33% | 97.68% | 97.22% | 99.91% | 104.02% |
| Core Deposits/Average Assets | 55.37% | 56.01% | 57.14% | 58.90% | 67.85% |

Source: UBPRs.

The FDIC's Atlanta Regional Office and Georgia's DBF alternated safety and soundness examinations of Haven, completing a total of seven examinations from December 2000 through January 2008, as shown in Table 2, which follows.

3

**Table 2: Haven's Examination History**

| Examination Date | Agency | Supervisory Ratings (UFIRS)* |
|---|---|---|
| 1/22/2008 | FDIC | 343232/3 |
| 8/1/2006 | State | 222122/2 |
| 6/20/2005 | FDIC | 222222/2 |
| 3/29/2004 | State | 222122/2 |
| 12/2/2002 | FDIC | 222222/2 |
| 12/10/2001 | State | 223323/3 |
| 12/20/2000 | FDIC | 212323/2 |

Source: FDIC's Virtual Supervisory Information on the Net Database.
*Financial institution regulators and examiners use the Uniform Financial Institutions Rating System
(UFIRS) to evaluate a bank's performance in six components represented by the CAMELS acronym: Capital
adequacy, Asset quality, Management practices, Earnings performance, Liquidity position, and Sensitivity to
market risk. Each component, and an overall composite score, is assigned a rating of 1 through 5, with
1 having the least regulatory concern and 5 having the greatest concern.

Although the FDIC and DBF Reports of Examination (ROE) expressed concerns about
the lending function from 2002 through 2006, it was not until the January 2008 ROE that
these concerns were reflected in the CAMELS ratings. To address examination concerns,
including apparent violations of laws and regulations, inadequate risk management
controls, and other safety and soundness issues, the FDIC and the bank entered into a
Memorandum of Understanding (MOU) in September 2008. Also, in August and
November 2008, the FDIC issued PCA letters notifying the bank that it was no longer
able to accept, renew, or roll over brokered deposits without an FDIC-approved waiver
due to the bank falling below the "Well Capitalized' PCA category. In September 2008,
the DBF began an examination of the bank and found significant deterioration of the
bank's condition and determined that the bank was no longer viable due to critical
deficiencies in all CAMELS components. Although a final ROE was not issued on the
September 2008 DBF examination, the draft indicates that on December 10, 2008,
Haven's BOD passed a resolution to turn the institution over to DBF for receivership and
the bank was closed on December 12, 2008.

## CAUSES OF FAILURE AND MATERIAL LOSS

The key cause of failure of the institution was that its BOD did not adequately identify,
measure, monitor, and control risk in its loan portfolio. Bank management pursued an
aggressive loan growth strategy concentrated in high-risk CRE construction and
development loans with poor loan underwriting and funded by high-cost deposits and
borrowings. Because the majority of CRE in the bank's portfolio was originated with
weak underwriting, such as little or no borrower equity in the project, much of the risk
associated with the loan portfolio tended to rest with the bank rather than the borrower.
As a result, the combination of the concentration of CRE and poor underwriting made the
bank vulnerable to fluctuations in the real estate market, and when that market declined,
the bank's loan portfolio became significantly impaired. By and large, bank management

4

ignored the increasing risks of the bank's loan originations and failed to address examiner concerns or take appropriate steps to manage those risks.

**Ineffective Board of Directors**

Examiners repeatedly identified that Haven's BOD did not adequately control risk in its loan portfolio. Management deficiencies included (1) a rapid growth strategy coupled with weak underwriting that resulted in a high-risk loan portfolio concentrated in CRE, (2) weak loan policies, (3) ignoring or not fully implementing examiner recommendations, and (4) not complying with laws and regulations. After the January 2008 examination, bank management largely ignored examiner recommendations and continued to grow the loan portfolio until September 2008, long after the real estate market started to decline. Management's lack of oversight and failure to control risk led to substantial losses and capital and liquidity erosion that accelerated the bank's deterioration and eventual failure.

**Rapid Growth Strategy.** As indicated in Figure 2, which follows, Haven grew at a rapid pace, from $64 million in assets in 2001 to approximately $575 million in 2008 – an increase of almost 800 percent, which was significantly higher than banks in its peer group.



Source: UBPRs.

While banks in its peer group averaged growth rates of about 15 percent from 2001 to 2008, Haven averaged over 40 percent. Moreover, its growth was in higher-risk CRE and ADC lending. By December 31, 2007, CRE loans represented 781 percent of examiner-adjusted Tier I Capital. Our analysis of Haven's loan portfolio from 2003 until

it failed indicates that management did not give adequate attention to diversification and, as a result, excessive concentrations occurred in the bank's CRE portfolio. Haven's management did not adequately address the *Interagency Guidance on Concentrations in Commercial Real Estate (CRE) Lending* issued in December 2006, even though the bank's CRE concentrations far exceeded the supervisory criteria in the guidance for additional bank management and examiner attention. Specifically, Haven management did not establish appropriate limits and standards for CRE lending. While ADC loans as a percentage of total capital for banks in its peer group ranged from 67 to 124 percent, Haven's percentage ranged from 415 to 626 percent, as shown in Figure 3, which follows.



Source: UBPR Reports.

This significant concentration in ADC loans[4] compared to the bank's peer group average made the bank vulnerable to changes in the real estate market.

---

[4] According to the joint *Guidance on Concentrations in Commercial Real Estate Lending* a significant concentration occurs when ADC loans represent 100 percent or more of total capital.

The bank's use of non-core deposits resulted in a higher cost of funds[5] than the cost of funds for banks in its peer group. From 2005 until it failed, Haven's cost of funds was 93 to 160 basis points higher than the cost of funds for banks in its peer group. Haven's cost of funds was also higher than most banks in the state of Georgia. For example, in 2007, the average cost of funds for the banks in Georgia was 3.43 percent, while Haven averaged 4.61 percent – 118 basis points higher. The higher cost of funds necessitated riskier lending in order to attain profitability. Overall, from December 2004 to September 2008, the bank became increasingly dependent on high-cost and non-core funds, as shown in Table 3, which follows.

**Table 3: Haven's Non-Core Funding Sources**

| Period Ended | Non-Core Funding Sources (Dollars in Thousands) | | |
|---|---|---|---|
| | **Time Deposits of $100,000 or More***| **Brokered Deposits** | **Federal Home Loan Bank Advances and Federal Funds Purchased** |
| Sept 08 | $146,804 | $84,773 | $42,300 |
| Dec 07 | $149,446 | $54,574 | $38,500 |
| Dec 06 | $98,008 | $47,097 | $21,000 |
| Dec 05 | $63,814 | $23,726 | $26,000 |
| Dec 04 | $26,773 | $9,377 | $17,000 |
| Dec 03 | $21,560 | $0 | $5,000 |

Source: OIG's analysis of Haven's UBPRs.
* Time deposits of $100,000 or more may include brokered deposits.

**Loan Policies.** Haven's loan policies were inadequate for the type of lending it engaged in. Specifically, its loan policy lacked written guidelines addressing risk diversification and limits for specific types of lending such as CRE and ADC loans, the use of interest reserves for the initial construction and development of real estate, out-of-territory loans, amount of borrower equity required, and limits on speculative development and construction loans. As a result, sound underwriting procedures were not implemented which eventually led to significant underwriting deficiencies within the loan portfolio.

According to the FDIC's *Risk Management Manual of Examination Policies* (Examination Manual), prudent management and administration of the overall loan account, including establishment of sound lending and collection policies, are of vital importance to the bank. In addition, Part 365 to Appendix A, *Interagency Guidelines for Real Estate Lending Policies,* provides the following regarding loan policies:

> The lending policy should contain a general outline of the scope and distribution of the institution's credit facilities and the manner in which real estate loans are made, serviced, and collected. In particular, the institution's policies on real estate lending should:
>
> • Identify the geographic areas in which the institution will consider lending.

---

[5] As used in this report, cost of funds was calculated using interest expense as a percentage of average earning assets.

- Establish a loan portfolio diversification policy and set limits for real estate loans by type and geographic market (e.g., limits on higher-risk loans).

- Identify appropriate terms and conditions by the type of real estate loan.

- Establish prudent underwriting standards that are clear and measurable, including loan to value (LTV) limits that are consistent with these supervisory guidelines.

- Establish review and approval procedures for exception loans, including loans with LTV percentages in excess of supervisory limits.

- Establish loan administration procedures, including documentation, disbursement, collateral inspection, collection, and loan review.

- Establish real estate appraisal and evaluation programs.

- Require that management monitor the loan portfolio and provide timely and adequate reports to the BOD.

- Avoid undue concentrations of risk.

- Monitor conditions in the real estate markets in its lending area so that it can react quickly to changes in market conditions that are relevant to its lending decisions.

Our review of bank records and interviews with bank examiners and bank employees indicated that the bank's loan policy either did not address or lacked sufficient criteria for the following:

- Collateral Inspections.
- Credit File Memorandums/Financial Analysis.
- Participated Loans Purchased.
- Out-of-Territory Loans.
- Incorporating the Current Allowance for Loan and Lease Losses (ALLL) Methodology into the Loan Policy.
- Financial Statements and Minimum Ratios.
- Interest Reserves.
- Minimum Equity Requirements.
- Limitations on Development and Construction Loans.
- Loan Policy Exceptions.

We discussed the loan policy with a former senior lender of the bank, and he stated that the policy was purposely general to allow flexibility in originating loans. Despite a high level of CRE lending, Haven's management did not develop a lending policy that incorporated credit underwriting standards detailed in the interagency guidance or establish internal limits for CRE concentrations.

8

**Implementation of Examiner Recommendations.** As early as June 2005, examiners noted contraventions of Appendix A to Part 365. Appendix A states, in part, that institutions should establish their own internal LTV limits for real estate loans. ROEs from 2005 through 2008 cited the bank for being in contravention of Part 365. Haven's president responded in both 2005 and 2006 that LTV exceptions would be tracked and reported to the BOD at least quarterly, but BOD minutes we reviewed indicate these actions were not done. By the January 2008 FDIC examination, Haven was again cited for loans in contravention to Appendix A, with numerous examples of substantial variances from acceptable supervisory LTVs provided in the 2008 ROE.

Further, ROEs from 2002 until the bank failed noted concerns about management practices, but Haven's management ignored the increasing risks of the bank's loan originations and did not take appropriate steps to manage those risks. Management deficiencies and risks in Haven's managerial structure are summarized in Table 4 below.

**Table 4: Examples of Examiner Comments and Recommendations Regarding Haven's Management**

| Examiner Comments | Examination Dates | | | | |
|---|---|---|---|---|---|
| | Dec 2002 | Mar 2004 | June 2005 | Aug 2006 | Jan 2008 |
| **Compliance with laws and regulations** | | | | | |
| • Apparent violations related to insider, affiliate, or Bank Secrecy Act activities | ✓ | ✓ | | ✓ | ✓ |
| • Apparent violations related to loan underwriting and/or credit administration | | | ✓ | ✓ | ✓ |
| **Growth of Haven's operations** | | | | | |
| • Loan portfolio was focused on CRE/ADC high-risk lending | | ✓ | ✓ | ✓ | ✓ |
| • Loan concentrations in brokered and/or out-of-territory loans | | | | | ✓ |
| **Loan policy and procedures** | | | | | |
| Inadequate loan policies | | | ✓ | | ✓ |
| • Inadequate loan underwriting and/or credit administration procedures | | | ✓ | ✓ | ✓ |
| • Inadequate loan review program | | | | | ✓ |
| **Risk management** | | | | | |
| • Inadequate internal audit program and/or related risk assessment process | | | | ✓ | ✓ |
| **Examiner recommendations** | | | | | |
| • Improve policies and procedures to ensure compliance with laws and regulations | ✓ | ✓ | ✓ | ✓ | ✓ |
| • Improve loan policy and procedures to include appropriate internal controls | | | | ✓ | ✓ |
| • Improve the loan review program and/or related watch list | | | | | ✓ |
| • Improve the audit program and related risk management activities | ✓ | ✓ | ✓ | ✓ | ✓ |
| • Improve loan underwriting and/or credit administration procedures | | | ✓ | ✓ | ✓ |

Source: Haven's ROEs issued by the DBF and FDIC.

At the conclusion of the January 2008 examination, the bank was advised by the FDIC to improve, among other things, its asset quality, including establishing limits on speculative construction and development loans. In discussions with bank management leading up to a proposed MOU (see Appendix 3 for details of the MOU), the FDIC told bank management that it needed to address loan underwriting and credit administration deficiencies and to correct violations of laws and regulations. However, bank management disregarded examiner concerns and continued increasing the loan portfolio.

From January 1, 2008 until it failed on December 12, 2008, Haven originated or renewed over $175 million in loans, most of which were CRE loans. Based on conversations with Division of Resolutions and Receiverships (DRR) liquidation specialists and our cursory review, the majority of these loans had underwriting deficiencies, and some were made for apparent insider benefit. Bank management continued to originate and renew risky loans despite the fact that the bank was cautioned by examiners to improve asset quality, and that the bank was operating with a net loss, declining capital, and deteriorating liquidity.

**Laws and Regulations.** A summary of the more significant examiner concerns regarding the bank's compliance with laws and regulations for the 2004 through 2008 examinations[6] follows:

- Appraisal Independence. Haven accepted appraisals prepared for someone other than Haven, an apparent violation of section 323.5(b)(1) of the FDIC Rules and Regulations.
- Federal Reserve Board Regulation O – Prior Approval. Haven did not obtain prior approval for extending credit over established thresholds to directors, shareholders, executive officers, or related interests.
- Federal Reserve Board Regulation O. Three apparent violations of Regulation O in the form of aggregated debt of one director exceeding regulatory limits, a loan for a director being given a favorable interest rate and a director's overdraft exceeding $1,000 for more than 5 consecutive days.
- Directors' Compensation. An apparent violation of Part 364 of the FDIC Rules and Regulations, in which directors' compensation in 2008 was considered unreasonable and detrimental to the bank.
- Brokered Deposits. An apparent violation of Part 337 of the FDIC Rules and Regulations in 2008 and 2005 for accepting brokered deposits while Haven was considered "Adequately Capitalized" for PCA purposes and had not submitted a brokered-deposit application waiver.
- Paying Debt of the Holding Company. An apparent violation of Federal Reserve Part 23A, regarding servicing the debt of the parent holding company at a time when Haven was prohibited from paying dividends to the holding company without prior approval from the DBF.

---

[6] Includes violations noted by state examiners during their 2008 examination.

- Dividend Payments without Approval. An apparent violation of Georgia Banking Rules for paying dividends to the parent holding company while prohibited by the rules and without prior approval of the DBF.

Of particular note, in April 2008, shortly after the 2008 FDIC examination was completed, Haven made four loans totaling about $2 million, one to each of four children of one of the bank's owners. These loans were all originated on the same day, with similar terms (interest payable monthly for the first year), and were reported to be secured by the stock of another financial institution's holding company. In the September 2008 examination, the DBF made a number of observations concerning these loans. When the loans were made, the bank had failed to obtain the stock certificates serving as collateral for the bank files. The value of the stock serving as collateral was indeterminable as there was no active market for the stock. In addition, examiners noted that the loans were apparently for the benefit of the father. The four children were all students with insufficient income sources to repay the debt. The bank obtained the personal guaranty of the father for each of the loans. The father's financial condition was reported to be financially leveraged, with limited liquidity, and his repayment ability was questionable. The DBF analyzed loans to bank owners and their related interests. Nine loans totaling in excess of $12 million, which included the aforementioned loans to the bank owner's children, were adversely classified by the DBF due to inadequate collateral support and repayment capacity of the borrowers. Examiners we interviewed commented that these loans could be apparent violations of Regulation O concerning loans to officers, directors, and shareholders.

### Underwriting and Credit Administration

Haven's failure can be directly attributed to the weak loan underwriting policies and practices used by the bank to extend and administer credit in the CRE market. These weaknesses included: (1) LTV ratios in excess of interagency guidelines, (2) incomplete or outdated financial information to assess a borrower's ability to repay, and (3) low or no borrower equity in a project. Also evident was weak loan administration, including poor funds disbursement practices. Because the majority of CRE in the bank's portfolio was originated with weak underwriting, including insufficient down payments or borrower equity, much of the risk associated with the loans tended to rest with the bank rather than the borrower. Exacerbating the weak underwriting problems was the fact that Haven's loan portfolio was concentrated in CRE, primarily in ADC loans. As of December 31, 2007, CRE loans totaled 602 percent of Tier 1 Capital, of which 504 percent represented ADC loans. Despite this heavy concentration of CRE and ADC lending, the bank's loan policy did not contain any internal limits on speculative constructive loans nor did it provide any specific procedures for monitoring CRE concentrations. Further, the loan policy did not provide any guidance governing the use of interest reserves, and the bank did not specifically track the use of interest reserves.

**LTV Guidelines.** The ROEs from 2005 through 2008 cited Haven for being in contravention of interagency guidelines in Part 365 of the FDIC Rules and Regulations

11

related to real estate LTV. The interagency guidelines (Table 5) provide the following LTV limits:

**Table 5: Supervisory LTV Limits**

| Loan Category | LTV Limit (Percent) |
|---|---|
| Raw land | 65 |
| Land development | 75 |
| Construction: Commercial, multifamily, and other non-residential | 80 |
| 1-4 family residential | 85 |

Source: FDIC Rules and Regulations Part 365.

Although Haven's loan policy contained the above LTV limits, in practice, Haven frequently exceeded the LTV limits, at times making loans with LTVs in excess of 100 percent. We interviewed one of the bank's senior lenders who stated that the LTV limits were only guidelines and that the bank would often make loans that exceeded the guidelines. Also, the bank would generally rely on appraised values rather than actual cost in computing LTV ratios. For example, examiners found one loan, which Haven financed for the purchase of land in downtown Atlanta with a purchase price of $6.5 million, but the appraisal Haven used to value the land was $11.3 million. Haven was able to lend the borrower $7.3 million (more than the cost of the land) yet show an LTV ratio of 65 percent, which was within the supervisory limits of the interagency guidelines. We found that Haven's practice for construction and development loans was to calculate the LTV ratio based on the value of the completed project rather than the cost of the project, and as a result, loan disbursements would exceed actual development and construction outlays (examples are provided later in this report). This practice is contrary to the interagency guidelines, which provide that supervisory LTV limits should be applied to the underlying property that collateralizes the loan. For loans that fund multiple phases of the same real estate project (e.g., a loan for both land development and construction of an office building), the appropriate LTV limit is the limit applicable to the final phase of the project funded by the loan; however, loan disbursements should not exceed actual development or construction outlays.

Part 365, Appendix A, of the FDIC Rules and Regulations provides, in part, that loans with LTV ratios in excess of supervisory LTV limits should be identified in the institution's records and the aggregate amount reported to the BOD at least quarterly. Every ROE since 2005 noted that Haven was not following this provision.

**Borrowers' Ability to Repay.** Regarding construction and development lending, the guidance provided to examiners stresses that prudent lending practices should include, among other things, the following:

- Feasibility studies, risk analyses, and sensitivity of income projections to economic variables.

12

- The minimum requirement for initial investment and equity maintained by the borrower.

- Standards for net worth, cash flow, and debt service coverage of the borrower or underlying property.

- Standards for the use of interest reserves or stipulation that interest reserves will not be used.

- Standards for the level of speculative loans relative to capital.

- Pre-sale and minimum unit release requirements for non-income producing property loans.

The 2008 FDIC examination noted that Haven's financial analysis of borrowers was weak. The ROE noted the following:

> To properly assess the completion status of projects and authorize funds disbursement, management should ensure that collateral inspections are conducted prior to loan disbursements and that appropriate documentation is maintained. Effective management of risk is dependent on the quality of analysis at origination as well as after the loan is advanced. Changes in the credit condition or the advancement of additional funds should be documented in credit memorandums, and credit memorandums should be updated at least annually. Global cash flows, contingent liabilities, interest carries, debt service coverage ratios, as well as strengths and weaknesses also need to be included in credit memorandums. In addition, when management relies on the borrower's net worth to support the credit, the credit memorandum needs to include management's validation or verification of the value of real estate and closely-held businesses.

**Credit Administration.** Credit administration practices at the bank were weak. Our review of loan files along with discussions with examiners indicated that loan files were poorly documented and that many loan files lacked cash flow analysis and collateral inspection reports. Examiners noted that credit files were not being updated at least annually and the bank frequently relied on stale appraisals. Further, Haven did not have adequate controls in place to ensure construction projects were inspected before loan disbursements were made. As discussed later in this report, this practice resulted in loan disbursements being made that were in excess of the value of completed construction.

**Participations Bought and Sold.** Financial institutions enter into loan participations for varied reasons. For some, a primary motivation is to enable the institution to originate loans that would otherwise exceed the legal lending limit of the institution. By selling loan participations to other financial institutions, a lead bank can stay within its legal lending limits while continuing to serve as the primary bank for a customer whose borrowing needs are outgrowing the legal limits of the bank. Some institutions may sell

13

or purchase loan participations as a risk management vehicle to diversify loan risks among a variety of loans in multiple lending communities.

Haven entered into a number of loan participation agreements with its affiliated banks that had the effect of putting Haven in a secondary-recipient position with the purchaser, instead of sharing the risk equally. In the event of default and resolution, the participating institution's credit would be fully satisfied before Haven collected any amounts towards its portion of the participation. From bank records that we reviewed, Haven sold at least $9 million in loan participations to its two affiliated banks that provided for the other banks to be paid in full before Haven could apply any loan proceeds to its portion of the loan. FDIC liquidation specialists we interviewed stated that this arrangement was not typical of loan participations and that by subordinating its loan position, Haven increased its risk.

**Use of Interest Reserves.** Haven underwrote ADC loans with corresponding interest reserve loans/provisions, which allowed borrowers to fund their interest payments through a borrowing line with the bank. However, Haven did not establish a system to measure, monitor, and control the volume of loans being underwritten with interest reserves. Based on our cursory review of the loan portfolio and interviews with bank personnel and FDIC liquidation specialists, we estimated that the majority of the $121 million of ADC loans at the 2008 examination were financed with the use of interest reserves.

Haven did not have appropriate controls related to the use and tracking of interest reserves, and Haven's loan policy did not address the use of interest reserves. Haven's use of interest reserves was not identified as a concern until the 2008 ROE. Examiners told us that, in retrospect, by using interest reserves, it appears that Haven might have been masking the borrowers' inability to meet their repayment obligations. We found several examples where the bank had renewed or replenished interest reserves, giving the appearance that certain loans were current when, in fact, they were experiencing problems. As a result, the bank's use of interest reserve loans masked the deterioration of the loan portfolio and the bank's earnings.

## Examples of Underwriting and Credit Administration Deficiencies

To gain insight into the underwriting deficiencies at Haven, we reviewed in detail 10 loan files and performed cursory reviews on several other files. The following examples illustrate the weak underwriting and poor credit administration problems at the bank and how interest reserves were used to mask underwriting and other problems.

**ADC Loan – Retail Shopping Center.** In November 2004, the bank entered into an ADC loan for $5.8 million with a developer to fund the acquisition of about 7 acres of land and the development and construction of a retail shopping center in suburban Atlanta. The purchase price of the land was $1.4 million. According to the bank's credit memorandum, the borrower was going to fund $600,000 of the land purchase and borrow

$800,000 from the bank. Following the $800,000 loan advance for the land purchase, the bank would provide an additional $5 million for the development of the land and construction of the shopping center buildings. As part of the loan terms and conditions, the bank required that the developer pre-lease 50 percent of the space before construction could begin. In June 2005, the bank began funding the development portion of the loan, and the developer estimated that it would be able to pre-lease, develop, and complete the project by December 31, 2006. Accordingly, the bank provided an 18-month interest reserve to fund interest payments through December 31, 2006. The loan was subsequently modified in June 2007, increasing the loan amount to $6.5 million, then again in January 2008, increasing the loan amount to $7.4 million. No principal had been paid on this loan through December 31, 2008, and it was financed using an interest reserve for 42 months, accruing almost $1 million of interest income.

Our review of this loan showed a number of underwriting and credit administration deficiencies:

- The original commitment required the borrower to provide $600,000 at the time the loan closed, but the borrower provided only $369,000. Although the land loan appeared to be made at a 57-percent LTV, the actual LTV was 74 percent, which is in excess of the interagency guidelines for land loans.

- A loan covenant requiring that the project be 50 percent pre-leased before construction was removed by the bank in October 2006 when the project was only 24 percent pre-leased, and it was evident the borrower was having difficulties in obtaining lease commitments.

- Each time the loan was modified, the bank replenished the interest reserve, giving the appearance that the loan was current when, in fact, the loan was experiencing problems. The bank financed the loan using interest reserves from June 2005 through December 31, 2008. As of March 31, 2009, the loan was delinquent.

- As the loan exceeded the bank's internal loan limit of $5 million and legal lending limit of $6 million, the bank needed to sell a portion of the loan to another party. When the bank could not find a buyer, it sold a portion of the loan to an affiliated bank. Bank officials we interviewed were unable to explain why the loan was renewed several times and indicated that the loan participation was created to stay within the bank's legal lending limit.

**ADC Loan – Acreage Redevelopment.** In 2004, Haven entered into an ADC loan with a developer for $3 million to fund the acquisition of a 25-acre site for development. In March 2005, the $3 million loan was closed and replaced with a new Haven loan of $4 million. Then in September 2007, Haven increased the loan to $5 million to allow for the acquisition of other nearby properties, design and planning costs, and interest reserves. Haven was to be paid by the sales of various portions of the project or by new loans taken out by the project's guarantor. The borrower's intention was to sell enough of the land within 12 months to retire the entire debt.

Our review of this loan disclosed a number of underwriting and credit administration deficiencies:

- The loan was renewed in 2005, 2007, and 2008, masking the life and performance history of the initial credit. We estimated that the bank used an interest reserve for this loan for 36 months.

- Each loan renewal increased the amount borrowed without covenants or restrictions related to development progress and loan funding.

- The 2007 loan renewal increased the loan to $5 million, up to the bank's internal lending limit and approaching Haven's legal lending limit. Haven increased the loan amount despite the developer's poor performance and the lack of progress in terms of development and sales of the residential units, the proceeds of which were to fund the loan payments. The 2007 loan renewal assisted the borrower with $800,000 (part of the $5 million total loan) for interest reserves and other requisite costs related to the development.

- In March 2009, the FDIC sold this loan at more than a 50-percent discount from book value.

**Loans to Purchase Investment Property.** According to documents in the loan file, in May 2008, subsequent to the FDIC's 2008 examination, the bank originated four loans for $500,000 each to fund the purchase of investment property. The loans were made to the children of one owner of the bank and were secured by the stock of a sister bank. The loans were set up as interest only with a 1-year term. These loans had significant underwriting deficiencies, including the following:

- Although purportedly made for investment property, the loans were not secured by any investment property, nor were the loan proceeds used to purchase property.

- The children did not have the financial wherewithal to repay the loans, as they all had incomes of less than $20,000.

- The stock used to secure the collateral was not publicly traded, which made it difficult to assess the stock's value. FDIC liquidation specialists told us that the collateral was likely worthless.

**Loan for a Speculative Townhouse Development.** In June 2007, the bank financed a 238-townhouse-development project with a loan commitment of $5.6 million. The credit memorandum notes that the loan was being renewed; however, the original loan amount was not in the loan file we reviewed. We noted the following deficiencies:

- Based on the loan file, 100 percent of the land acquisition was financed, which is in contravention with the interagency guidelines for real estate lending.

- The loan file noted it was "venture speculative" and was being made in a soft real estate market. There was nothing in the file to indicate that the borrower had put any hard equity into the project.

- The loan was funded using an interest reserve, and the loan terms were vague regarding how long the interest reserve would be used.

- About $1.3 million of the loan was sold as a participation, but the terms of the participation agreement provided that the participant would receive principal payments before Haven. As a result, all the payment risk remained with Haven.

- The loan file had no inspection reports to show that work was performed before loan disbursements were made. As of September 2008, approximately $4.3 million had been disbursed on this loan. The FDIC obtained an appraisal of the property (see Figure 4) in April 2009, which showed no construction on the project, and estimated that the project was about one-third complete, yet 75 percent of the loan proceeds had been disbursed.

**Figure 4: Property Related to a Loan**



Haven used a value of $9.5 million in 2007 in calculating a 60% LTV. The project was appraised in April 2009 for just over $1 million. As shown in the picture, no vertical construction had been started even though the loan was 75% disbursed.

Source: Appraisal obtained by the FDIC.

## ASSESSMENT OF FDIC SUPERVISION

Although the FDIC and DBF conducted regular examinations of Haven, the bank's high-risk profile and many red flags warranted earlier and greater attention. ROEs from the bank's inception noted a pattern of questionable insider dealings; rapid growth; and concentrations in high-risk CRE/ADC loans, funded by high-cost deposits and borrowings. However, Haven's apparently high earnings and apparently adequate capital levels, along with an expectation by regulators that bank ownership would infuse capital

when needed as they had done in the past, combined to delay effective supervisory actions. When the January 2008 FDIC ROE noted deterioration in the financial condition of the bank, the CAMELS composite rating was lowered to a 3, and asset quality was downgraded to a 4, among other CAMELS component downgrades. The bank was placed under an MOU in September 2008 . In August 2008, the bank was notified that under PCA, it could no longer accept brokered deposits without an FDIC-approved waiver. However, the DBF noted in its September 2008 examination that as of December 2008, the bank was not in compliance with most of the MOU provisions. Additionally, this examination noted that many of the deficiencies identified in the prior examination had not been corrected, including maintaining capital sufficient to mitigate the high CRE/ADC concentration risk and addressing contingency liquidity needs. The FDIC has authority to take a wide range of supervisory actions. In the case of Haven, however, these supervisory actions were not timely and effective in addressing the bank's most significant problems.

**Repeat Concerns from Recent Examinations**

Starting with the June 2005 ROE, examiners questioned Haven's loan policies, procedures, loan documentation, and credit administration procedures. Additionally, examiners identified apparent violations of laws and regulations in every ROE since 2002. Haven's management did not take sufficient corrective actions, as these apparent violations were still evident in 2008.

Haven's CRE loan concentrations were discussed in ROEs dating back to 2004. Monitoring and reporting processes related to loan concentrations were found deficient. Haven did not take sufficient action to mitigate risk from the CRE concentration deficiencies. ROEs from 2004 through January 2008 included statements that the bank's loan portfolio was focused on high-risk CRE/ADC lending. The January 2008 ROE also stated that the level of concentrations posed extreme risk to the bank's capital and earnings and required heightened oversight from the BOD and senior management. The ROE further stated that bank management failed to control concentration risk by failing to establish internal risk limits for different types of CRE lending or implement sufficient credit underwriting standards. The ROE noted that management also failed to maintain a sufficient level of capital to mitigate the high level of concentration risk and did not have adequate capital and contingency liquidity plans. However, examiners did not take stronger actions to limit the level of the concentrations or to mitigate the degree of risk taken by increasing capital levels until the August 2008 PCA notification and the September 2008 MOU. Among other things, the MOU required the bank to formulate and implement a sound lending policy, develop/follow procedures for effective loan underwriting and credit administration, and monitor and document all loans in excess of supervisory LTV guidelines. By the time the MOU was issued in September 2008, Haven's failure was all but inevitable. DSC took limited actions to mitigate the bank's aggregate level of risk exposure, in large part because of the apparent strong financial condition of the bank. Also, despite repeated assurances by management that it would

18

take corrective actions, no comprehensive action was taken to address examiner concerns.

DSC examiners noted in the 2005 ROE that the bank was in apparent violation of laws and regulations for inadequate real estate appraisals and loan originations exceeding real estate LTV limits. Additionally, examiners noted a contravention of Appendix A of Part 365 of the FDIC Rules and Regulations, as the bank frequently exceeded the LTV limits and was not tracking or adequately justifying the exceptions. Examiners suggested that bank management ensure maintenance of appropriate documentation for its real estate loans. The examiners at the 2005 examination recommended the following revisions to the bank's loan policy:

- An exception report for loans exceeding supervisory LTV limitations should be kept and reported to the BOD quarterly. In addition, the policy should be revised to require that the aggregate of all loans exceeding the supervisory limitations should not exceed 100 percent of risk-based capital and that commercial real estate exceeding the supervisory limitations should not exceed 30 percent of risk-based capital.

- Statutory lending limits for unsecured/secured loans to one borrower should be addressed.

- The policy should be amended to reflect the bank's current practice for loan review.

- Thresholds should be required for financial information, i.e., financial statements and tax returns.

- A threshold for industry concentrations should be established at 100 percent of Tier 1 Capital to coincide with regulatory monitoring.

As far as we could determine, none of these recommendations, which could have minimized the eventual impact on the bank's financial condition, were implemented by Haven management.

**Following up on Red Flags**

Examiners did not always follow up on red flags during examinations of Haven. In particular, certain management practices should have heightened examiner attention in some areas. Red flags that warranted more in-depth review included: (1) the use of interest reserves to keep loans current; (2) many instances of loan renewals and modifications; (3) a deficient loan policy that did not address interest reserves, concentration limits, and other key borrower information; and (4) the appearance of numerous insider transactions. A more in-depth review by examiners could have revealed the problems earlier, and supervisory actions may have been taken sooner. The lack of action was based, in part, on the high apparent earnings of the bank, its apparently

adequate capital levels, and reliance by regulators on bank ownership to infuse capital when needed.

DSC examination guidance states that it is essential for examiners to be alert for irregular or unusual activity, and to fully examine the circumstances surrounding the activity to determine whether there is any substance to them. As necessary, field personnel should perform additional work to ensure that the matters are resolved promptly. Our review of ROEs and related records showed that management deficiencies were evident at Haven for many years. For the most part, examiners identified the management deficiencies and brought their concerns to bank management in ROEs and exit meetings with bank officials, yet we noted that many of the deficient management practices continued until the bank's failure.

According to examiners we interviewed, Haven's loan files typically lacked documentation to fully support a borrowers' ability to repay a loan. Also, many loan files lacked documentation for an examiner to fully analyze the borrowers' financial condition. Although examiners identified many technical exceptions in the lending area, individual loans were seldom criticized in ROEs until 2008, because the loans were performing in accordance with the loan agreements and, according to appraisals on file, appeared to have sufficient collateral underlying the loans.

### Risk Identification and Analysis

Examiners did not fully identify risks to the institution in examinations performed. Specific areas that warranted more supervisory scrutiny included the bank's inappropriate use of interest reserves, use of questionable loan participations, and the bank's determination of its ALLL.

The bank's use of interest reserve loans and the lack of appropriate policies and controls over interest reserves were not noted until the 2008 ROE, despite use at Haven from at least 2004. Bank officials we interviewed indicated that the majority of Haven's ADC loans were financed with interest reserves. We found several examples where loans had been renewed multiple times, which had the effect of masking loan problems. One loan we reviewed was financed with an interest reserve for 42 months and accrued over $1 million of interest income; however, examiners did not criticize the loan because it was performing in accordance with the loan agreement and appeared to have a low LTV.

In addition, Haven's use of loan participations, which appear to have masked loan problems, were not addressed in examination reports. While reviewing bank records, we found at least $9 million in loan participations to Haven's two affiliated banks that, in our opinion, did not appear to be arm's-length transactions. The participation agreements provided for the other banks to be paid in full before Haven could apply any loan proceeds to its portion of the loan, which raises questions as to the appropriateness of such transactions. FDIC liquidation specialists we interviewed stated that this arrangement was not typical of loan participations and significantly increased risk to the bank.

20

ROEs from 2004 through January 2008 were generally not critical of the bank's ALLL. The DBF's September 2008 examination noted that the bank was in contravention of the December 2006 *Interagency Policy Statement on the Allowance for Loan and Lease Losses* (Interagency ALLL Guidance). The DBF found that the bank's ALLL analysis was flawed due to its use of outdated appraisals, lack of management recognition of loans that were subject to impairment analysis, and a lack of qualitative factors for assessing the ALLL. The DBF also found the ALLL to be inadequate and determined that the ALLL methodology did not provide a reasonable estimate of loss in the loan portfolio.

In our opinion, additional examiner attention should have been given to the analysis of the bank's ALLL. The Interagency ALLL Guidance provides the following:

> The foundation of any loan review system is accurate and timely loan classification or credit grading, which involves an assessment of credit quality and leads to the identification of problem loans. An effective loan classification or credit grading system provides important information on the collectibility of the portfolio for use in determination of an appropriate level for the ALLL.

Based on our observations and interviews with examiners and former bank employees, Haven did not have an effective loan review or loan grading program – key elements in determining the adequacy of the ALLL. In addition, despite a higher-than-average risk in its loan portfolio, Haven's ALLL as a percent of total loans was typically less than the ALLL of the 1,100 banks comprising its peer group. For example, as of December 31, 2007, Haven's ALLL represented 1.01 percent of total loans compared to the 1.21 percent average for banks in its peer group. Given the inherent risk in Haven's loan portfolio, examiners should have required bank management to develop a better methodology for determining its ALLL earlier than 2008.

## IMPLEMENTATION OF PCA

Although the FDIC complied with the PCA provisions of the FDI Act, PCA was not effective at limiting loss to the DIF. On August 12, 2008, 4 months before the bank ultimately failed, the FDIC notified Haven that its Total Risk-Based Capital Ratio had declined to 8.75 percent based on the bank's June 30, 2008 Reports of Condition and Income (Call Report) data and, as a result, the bank fell from the "Well Capitalized" category to the "Adequately Capitalized" category under PCA provisions. In accordance with PCA provisions, the bank was notified that it would therefore have to apply for a waiver from the FDIC in order to accept or renew brokered deposits. On November 17, 2008, the FDIC's Atlanta Regional Office notified Haven that based on September 30, 2008 Call Report data, Haven's capital ratios were:

| | |
|---|---|
| Tier 1 Leverage Capital Ratio | 4.42 percent |
| Tier 1 Risk-Based Capital Ratio: | 4.90 percent |
| Total Risk-Based Capital Ratio: | 6.16 percent |

Under PCA, Haven was considered "Undercapitalized" and was subject to restrictions on asset growth, dividends, other capital distributions, and management fees pursuant to section 38(d) of the FDI Act. We concluded that the FDIC appropriately used its authority under PCA to prohibit the bank from accepting or renewing brokered deposits and placing other required restrictions on the bank.

The purpose of PCA is to resolve problems of insured depository institutions at the least possible long-term loss to the DIF. PCA's focus is on capital, and capital can be a lagging indicator of an institution's financial health as was the case with Haven. Haven remained in the "Well Capitalized" PCA category until June 30, 2008, even though the bank had many problems as detailed in this report. The inappropriate use of interest reserves and the bank's common practice of renewing problem loans delayed the recognition of problems and, ultimately, the deterioration of earnings and capital. By the time Haven's capital level fell below the required threshold necessary to implement stronger PCA provisions in November 2008, the bank's condition had deteriorated to the point at which the institution was not viable, absent a massive capital infusion.

## CORPORATION COMMENTS AND OIG EVALUATION

On July 31, 2009, the Director, DSC, provided a written response to the draft report. DSC's response is provided in its entirety as Appendix 4 of this report. In its response, DSC agreed that, despite Haven's apparently strong financial condition, earlier enforcement actions and management component rating downgrades could have been used to address persistent risk management weaknesses. Also, DSC's comments reiterated the cause of the failure and lack of implementation of examiner recommendations.

## OBJECTIVES, SCOPE, AND METHODOLOGY

### Objectives

We performed this audit in accordance with section 38(k) of the FDI Act, which provides that if a deposit insurance fund incurs a material loss with respect to an insured depository institution, on or after July 1, 1993, the Inspector General of the appropriate federal banking agency shall prepare a report to that agency reviewing the agency's supervision of the institution. The FDI Act requires that the report be completed within 6 months after it becomes apparent that a material loss has been incurred.

Our audit objectives were to (1) determine the causes of the financial institution's failure and resulting material loss to the DIF and (2) evaluate the FDIC's supervision of the institution, including implementation of the PCA provisions of section 38.

We conducted the audit from February 2009 to May 2009 in accordance with generally accepted government auditing standards. However, due to the limited scope and objectives established for material loss reviews, which are generally applied to just one financial institution, it may not have been feasible to address certain aspects of the standards, as described in the sections that follow.

### Scope and Methodology

The scope of this audit included an analysis of Haven's operations from January 24, 2000 until the bank's failure on December 12, 2008. Our review also entailed an evaluation of the regulatory supervision of the institution over the same period.

To achieve the objectives, we performed the following procedures and techniques:

- Analyzed ROEs and visitation reports prepared by the FDIC and DBF examiners from 2001 to 2008.

- Reviewed the following:

  - Bank data and correspondence maintained at the DSC's ARO and Atlanta Field Office.

  - Reports prepared by the DRR and DSC relating to the bank's closure.

  - Review of the bank's external auditor, Mauldin & Jenkins, at the offices of Carlock, Copeland, & Stair, LLP, in Atlanta, Georgia.

- Bank records maintained by DRR in the Dallas Regional Office that would provide insight into the bank's failure, various annual reports, and accompanying financial statements.

- Loan files at the receivership in Duluth, Georgia.

- Pertinent DSC policies and procedures.

- Interviewed the following FDIC officials:

  - DSC management in Washington, D.C., and Atlanta, Georgia.

  - DRR officials at the Dallas Regional Office.

  - FDIC examiners from the DSC Atlanta Field Office who participated in examinations or reviews of examinations of Haven.

- Interviewed various former bank employees familiar with Haven's operations.

- Met with officials from the DBF to discuss the historical perspective of the institution, its examinations, state banking laws, and other activities regarding the state's supervision of the bank.

- Researched various banking laws and regulations, including State of Georgia laws.

## Internal Control, Reliance on Computer-processed Information, Performance Measurement, and Compliance With Laws and Regulations

Due to the limited nature of the audit objectives, we did not assess DSC's overall internal control or management control structure. We performed a limited review of Haven's management controls pertaining to its operations as discussed in the finding section of this report. For purposes of the audit, we did not rely on computer-processed data to support our significant findings and conclusions. Our review centered on interviews, ROEs and correspondence, and other evidence to support our audit.

The Government Performance and Results Act of 1993 (the Results Act) directs Executive Branch agencies to develop a customer-focused strategic plan, align agency programs and activities with concrete missions and goals, and prepare and report on annual performance plans. For this material loss review, we did not assess the strengths and weaknesses of DSC's annual performance plan in meeting the requirements of the Results Act because such an assessment is not part of the audit objectives. DSC's compliance with the Results Act is reviewed in program audits of DSC operations.

Regarding compliance with laws and regulations, we performed tests to determine whether the FDIC had complied with provisions of PCA and limited tests to determine

compliance with certain aspects of the FDI Act. The results of our tests were discussed, where appropriate, in the report. Additionally, we assessed the risk of fraud and abuse related to our objectives in the course of evaluating audit evidence.

# GLOSSARY OF TERMS

| Term | Definition |
|------|-----------|
| **Adversely Classified Assets** | Assets subject to criticism and/or comment in an examination report. Adversely classified assets are allocated on the basis of risk (lowest to highest) into three categories: Substandard, Doubtful, and Loss. |
| **Allowance for Loan and Lease Losses (ALLL)** | Federally insured depository institutions must maintain an ALLL that is adequate to absorb the estimated loan losses associated with the loan and lease portfolio (including all binding commitments to lend). To the extent not provided for in a separate liability account, the ALLL should also be sufficient to absorb estimated loan losses associated with off-balance sheet loan instruments such as standby letters of loan. |
| **Concentration** | A concentration is a significantly large volume of economically related assets that an institution has advanced or committed to a certain industry, person, entity, or affiliated group. These assets may, in the aggregate, present a substantial risk to the safety and soundness of the institution. |
| **Memorandum of Understanding (MOU)** | An informal corrective administrative action for institutions considered to be of supervisory concern, but which have not deteriorated to the point where they warrant formal administrative action. As a general rule, an MOU is to be considered for all institutions rated a composite 3. |
| **Prompt Corrective Action (PCA)** | The purpose of PCA is to resolve the problems of insured depository institutions at the least possible long-term cost to the DIF. Part 325, subpart B, of the FDIC Rules and Regulations, 12 Code of Federal Regulations, section 325.101, et. seq., implements section 38, *Prompt Corrective Action*, of the FDI Act, 12 United States Code section 1831(o), by establishing a framework for taking prompt supervisory actions against insured nonmember banks that are less than adequately capitalized. The following terms are used to describe capital adequacy: (1) Well Capitalized, (2) Adequately Capitalized, (3) Undercapitalized, (4) Significantly Undercapitalized, and (5) Critically Undercapitalized.<br><br>A PCA Directive is a formal enforcement action seeking corrective action of compliance with the PCA statute with respect to an institution that falls within any of the three categories of undercapitalized institutions. |
| **Regulation O** | Limits extensions of credit to any one of a bank's executive officers, directors, or principal shareholders or any related interest of that person that when aggregated with the amount of all other extensions of credit by the member bank to that person and to all related interests of that person, exceed 15 percent of the bank's unimpaired capital and unimpaired surplus. |
| **Uniform Bank Performance Report (UBPR)** | The UBPR is an individual analysis of financial institution financial data and ratios that includes extensive comparisons to peer group performance. The report is produced by the Federal Financial Institutions Examination Council for the use of banking supervisors, bankers, and the general public and is produced quarterly from Call Report data submitted by banks. |

APPENDIX 3

## HAVEN'S COMPLIANCE WITH ENFORCEMENT ACTION

Haven's Compliance Record with the FDIC's September 2008 MOU[*]

| DBF Description of Enforcement Action Provisions | DBF Assessment of Status as of December 1, 2008 | Compliance Comments |
|---|---|---|
| Risk position in each substandard asset of $1 million or more to be monitored and reported to the BOD. | Not in compliance. | Haven engaged a consultant to assist with an action plan, but no action plans were submitted by December 1, 2008. |
| Eliminate from the books all assets classified as "loss." | Not in compliance. | Haven charged off over $410,000 in loans based on the DBF examination. |
| Formulate, adopt, and implement a sound written lending policy. | Not in compliance; not addressed. Haven's revised September 22, 2008 loan policy failed to address a number of criticisms in the ROE. | Financial statements and minimum ratios, interest reserves, minimum equity requirements, and limitations on development and construction costs were not addressed. |
| Develop/follow procedures for effective loan underwriting and credit administration. | Not in compliance. | Collateral inspections and out-of-territory lending provisions were not addressed. |
| Monitor and document all loans in excess of supervisory LTV guidelines. | Not in compliance. | Report was developed but never evident in BOD meetings following the MOU. |
| Develop, adopt, and implement a written contingency liquidity plan (CLP). | Not in compliance; not addressed. | No comprehensive written CLP was developed as of December 1, 2008. |
| Revise the capital, liquidity, and asset/liability policies. | Not in compliance; not addressed. | The BOD had not approved a revised capital policy. |
| Eliminate/correct apparent violations of laws and regulations and contraventions of policy and guidance. | Not in compliance; not corrected. | CRE concentration, LTV, and insider overdraft problems not fully addressed. |
| BOD to review and approve the bank's 2008 budget. | Not in compliance. | BOD approval of the budget was not done since issuance of the MOU. |
| Submit a capital plan to the Supervisory Authorities. | Not in compliance. | No capital plan was submitted as of December 1, 2008. |
| Do not declare or pay dividends without prior written consent of the Supervisory Authorities. | Not in compliance. | No capital plan was submitted to Supervisory Authorities as of December 1, 2008. |
| Develop an audit tracking report outlining deficiencies in the ROE. | Not in compliance. | Report was developed but not included in the quarterly progress report submitted on October 31, 2008. |

Source: OIG review of the FDIC September 2008 MOU and ROEs.
[*] The FDIC MOU has 18 conditions. This table lists only the 12 conditions for which the DBF assessed noncompliance as of December 1, 2008.

APPENDIX 4

## CORPORATION COMMENTS



**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, D.C. 20429-9990                                        Division of Supervision and Consumer Protection

July 31, 2009

MEMORANDUM TO:      Russell A. Rau
                    Assistant Inspector General for Audits

FROM:               Sandra L. Thompson
                    Director

SUBJECT:            Draft Audit Report Entitled, Material Loss Review of Haven Trust
                    Bank, Duluth, Georgia (Assignment No. 2009-014)

Pursuant to Section 38(k) of the Federal Deposit Insurance Act (FDI Act), the Federal Deposit
Insurance Corporation's Office of Inspector General (OIG) conducted a material loss review of
Haven Trust Bank (Haven Trust), which failed on December 12, 2008. This memorandum is the
response of the Division of Supervision and Consumer Protection (DSC) to the OIG's Draft
Audit Report received on July 16, 2009.

The Draft Audit Report concludes that the FDIC and the Georgia Department of Banking and
Finance conducted regular examinations of Haven Trust, diagnosed issues, and prescribed
corrective measures. The report further concludes that Haven Trust failed because the Board of
Directors and management did not adequately control the risks identified by examiners and did
not implement recommended corrective actions. We agree that, despite Haven Trust's
apparently strong financial condition, earlier enforcement actions and management component
rating downgrades could have been used to address the persistent risk management weaknesses.

Thank you for the opportunity to review and comment on the Draft Audit Report.

## ACRONYMS IN THE REPORT

| Acronym | Definition |
|---------|------------|
| ADC | Acquisition, Development, and Construction |
| ALLL | Allowance for Loan and Lease Losses |
| BOD | Board of Directors |
| CAMELS | Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk |
| CLP | Contingency Liquidity Plan |
| CRE | Commercial Real Estate |
| DBF | Division of Banking and Finance (State of Georgia Regulatory Agency) |
| DIF | Deposit Insurance Fund |
| DRR | Division of Resolutions and Receiverships |
| DSC | Division of Supervision and Consumer Protection |
| FDI | Federal Deposit Insurance |
| FHLB | Federal Home Loan Bank |
| HTB | Haven Trust Bank |
| LTV | Loan to Value |
| MOU | Memorandum of Understanding |
| OIG | Office of Inspector General |
| PCA | Prompt Corrective Action |
| ROE | Report of Examination |
| UBPR | Uniform Bank Performance Report |
| UFIRS | Uniform Financial Institutions Rating System |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| MUKTA PATEL, on Behalf of Herself : | |
| And All Others Similarly Situated, : | Case No.: |
| : | |
| Plaintiff, : | CLASS ACTION |
| : | |
| v. : | |
| : | |
| R. C. PATEL, MUKESH C. PATEL, : | COMPLAINT FOR |
| BRIG M. KAPOOL, MUKUND R. PATEL, : | VIOLATION OF |
| NARENDA D. PATEL, and : | THE FEDERAL |
| DHIRU G. PATEL, : | SECURITIES LAWS |
| : | |
| Defendants. : | |
| : | DEMAND FOR JURY TRIAL |

## CERTIFICATION

Counsel for plaintiff hereby certifies that the text of this document has been

prepared with Times New Roman 14 point, one of the fonts and point selections

approved by the Court, and complies in all respects with Local Rule 5.1(C) of the

United States District Court, Northern District of Georgia.

Respectfully submitted, this 30th day of December, 2009.

GORBY PETERS & ASSOCIATES, LLC

/s/  Michael J. Gorby, Esq.
Michael J. Gorby, Esq.
mgorby@gorbypeters.com
(Georgia Bar No. 301950)
Two Ravina Drive, Suite 1500
Atlanta, Georgia 30346-2106
Telephone:  (404) 239-1150
Fax: (404) 239-1179

Lawrence J. Lederer
Robin Switzenbaum
Arthur Stock
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email: llederer@bm.net
        rswitzenbaum@bm.net
        astock@bm.net

*Attorneys for Plaintiff Mukta Patel*