# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| MUKTA PATEL, ASHOK PAREKH, | : | Case No.: 09-CV-3684-CAP |
| JITU PATEL, and ANDREA and PHIL | : | |
| BOSWELL, on Behalf of Themselves | : | CLASS ACTION |
| And All Others Similarly Situated | : | |
| | : | |
| Plaintiffs, | : | |
| | : | AMENDED COMPLAINT FOR |
| v. | : | VIOLATION OF THE FEDERAL |
| | : | SECURITIES LAWS |
| MUKESH C. PATEL, R.C. PATEL, | : | |
| EDWARD L. BRISCOE, SCOTT DIX, | : | |
| BRIJ M. KAPOOR, MUKUND R. | : | |
| PATEL, NARENDA D. PATEL, | : | |
| DHIRU G. PATEL, and BALVANT | : | |
| PATEL, | : | |
| Defendants. | : | |
| | : | DEMAND FOR JURY TRIAL |

## <u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION .......................................................................2

II.   JURISDICTION AND VENUE ................................................................4

III.  THE PARTIES ...........................................................................................5

    A.   Plaintiffs ............................................................................................5

    B.   Defendants .........................................................................................6

IV.   CLASS ALLEGATIONS ........................................................................10

V.    FACTS SUPPORTING NON-FRAUD CLAIMS ...................................12

    A.   Background ......................................................................................12

    B.   Operations of the Bank....................................................................14

    C.   Regulatory Examinations and Other Proceedings ...........................19

    D.   The Decline and Failure of the Bank ..............................................23

    E.   The Defendants' Responsibility for the Bank's and Haven Trust's
        Failure..............................................................................................26

    F.   Securities Offerings and False Statements .......................................27

        1.   The 2006 Offering..................................................................27

        2.   The 2008 Offering..................................................................37

VI.   LOSS CAUSATION ...............................................................................48

COUNT I.................................................................................................................49

COUNT II................................................................................................................50

COUNT III...............................................................................................................52

VII.  ADDITIONAL FACTS SUPPORTING FRAUD CLAIMS ....................53

COUNT IV...............................................................................................................56

COUNT V ...............................................................................................................60

COUNT VI...............................................................................................................61

COUNT VII.............................................................................................................63

COUNT VIII ...........................................................................................................64

i

Lead Plaintiff, Mukta Patel, and additional plaintiffs Ashok Parekh, Jitu Patel, and Andrea and Phil Boswell (collectively, the "Plaintiffs"), individually and on behalf of all other persons or entities that purchased and/or acquired the common stock ("stock") of Haven Trust Bancorp, Inc. ("Haven Trust" or the "Company") between April 1, 2006 and December 12, 2008, inclusive (the "Class"), allege the following based upon information and belief, except as to those allegations concerning themselves, which are based upon personal knowledge.  Plaintiffs' information and belief allegations are based upon, among other things: (a) the investigation conducted by and through their attorneys; (b) review of private placement memorandum ("PPM") for the 2006 offering dated March 31, 2006 ("2006 Offering"); (c) review of the PPM for the 2008 offering dated March 31, 2008 ("2008 Offering"); (d) review and analysis of public statements, news articles, and other publications disseminated by or concerning Haven Trust; (e) review of information contained in the bankruptcy filings of Haven Trust; (f) review of a report (the "Audit Report") prepared by the Federal Deposit Insurance Corp. ("FDIC") concerning the demise of Haven Trust's sole operating subsidiary; (g) interviews of relevant parties and former employees of Haven Trust; and (h) other publicly available information about Haven Trust.

1

Most of the facts supporting the allegations contained herein are known only to the defendants or to the successors of Haven Trust, or are within their control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this complaint (the "Complaint") after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the stock of Haven Trust between April 1, 2006 and December 12, 2008, inclusive (the "Class Period"), against certain directors and/or officers of Haven Trust ("Defendants") and its banking subsidiary, Haven Trust Bank (the "Bank"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), the Georgia Securities Act of 1973[1] and Georgia common law. Plaintiffs also bring this action on behalf of a subclass consisting of all members of the Class who purchased Haven Trust stock during the period between December 31, 2007 and December 12, 2008, inclusive (the "Subclass").  The

---

[1]     On July 1, 2009, the Georgia Securities Act of 1973 was repealed and replaced by the Georgia Uniform Securities Act of 2008.  The Class Period alleged herein ends on December 12, 2008.  As a result, the Georgia Securities Act of 1973 governs the conduct of Defendants described herein.

Subclass brings claims against all Defendants for violations of the Georgia Securities Act of 1973, which are governed by a two-year statute of limitations.

2.     The claims alleged herein relate to misrepresentations and omissions made by the Defendants in oral statements and confidential PPM purporting to describe the Haven Trust investment, regarding the Bank's failure to control risk in its lending practices, and failure to address issues raised by regulatory authorities regarding those practices, including violations of certain laws and regulations relating to both lending and acceptance of brokered deposits, and repeated recommendations to improve lending practices.  The misrepresentations and omissions affected all Class Members similarly in that had prospective investors been informed of these practices, they would not have invested in Haven Trust stock.

3.     The Bank's excessively risky lending practices, together with its excessively high cost of funds obtained through brokered deposits, ultimately led to Haven Trust's failure.  On December 12, 2008, the FDIC and the Georgia Department of Banking and Finance ("Georgia DBF") announced that the Bank had been closed by state regulatory action, with the FDIC appointed as receiver. Its operations were subsequently taken over by Branch Banking & Trust ("BB&T").  The Bank's failure forced Haven Trust to enter into Chapter 7

3

bankruptcy on February 23, 2009 (the "Bankruptcy").  The FDIC has estimated

that the Bank's liquidation will cost the FDIC's insurance fund for customer

accounts over $200 million.  Shareholders have lost their entire investment.

## II.     JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action

pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C.

§§ 1331, 1337 and 1367.

5.     Jurisdiction of this matter is also proper pursuant to diversity of

citizenship, 28 U.S.C. § 1332(d)(2).  This case is brought as a Class Action.  Lead

Plaintiff is a citizen of North Carolina, all of the Defendants are citizens of

Georgia, and the amount in controversy exceeds $5 million.

6.     The claims alleged herein arise under Sections 10(b) and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under

Section 10(b) (17 C.F.R. § 240.10b-5), and Georgia statutory and common law.

7.     Venue is proper in this District pursuant to Section 27 of the

Exchange Act, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of

the alleged fraud and/or its effects, including omissions by defendants, occurred in

this District.  Additionally, the Company's headquarters were located in Duluth,

Georgia, in this Judicial District, and Haven Trust was incorporated in Georgia and filed for bankruptcy in this Judicial District.

8.      In connection with omissions complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail and interstate telephone communications.

### III.    THE PARTIES

#### A.    Plaintiffs

9.      Lead Plaintiff Mukta Patel purchased 4,000 shares of Haven Trust stock for $100,000 on September 23, 2008, as described in the attached certification, and has suffered economic harm as a result of the omissions made by Defendants as alleged herein.  She still retains these shares, which are now worthless.  She resides in Greenville, North Carolina and is a member of the Subclass.

10.     Plaintiff Ashok Parekh purchased 4,000 shares of Haven Trust stock on December 28, 2006, as described in the attached certification, and has suffered economic harm as a result of the omissions made by Defendants as alleged herein. He still retains these shares, which are now worthless.  Mr. Parekh resides in Duluth, Georgia.

5

11.     Plaintiff Jitu Patel purchased 3,000 shares of Haven Trust stock on December 28, 2006, as described in the attached certification, and has suffered economic harm as a result of the omissions made by Defendants as alleged herein. He still retains these shares, which are now worthless.  Jitu Patel resides in Conyers, Georgia.

12.     Plaintiffs Andrea and Phil Boswell purchased 1,000 shares of Haven Trust stock on September 25, 2008, as described in the attached certification, and have suffered economic harm as a result of the omissions made by Defendants as alleged herein.  They still retain these shares which are now worthless.  They reside in Peachtree City, Georgia and are a member of the Subclass.

**B.      Defendants**

13.     Defendant Mukesh C. "Mike" Patel ("Mukesh Patel") was a founder and Chairman of the Board of Directors of Haven Trust and the Bank from 2000 through 2008.  Mukesh Patel is also a senior official and co-founder, along with his brother, defendant Rajesh "R. C." Patel ("R.C. Patel"), of the Diplomat Hotel Corporation.  The Diplomat Hotel Corporation owns and operates hotels primarily in the Southeastern United States and is located in Atlanta, Georgia.  Mukesh Patel resides in Duluth, Georgia.  Throughout the Class Period, Mukesh Patel, together

6

with his brother R.C. Patel, was the public face of Haven Trust, meeting with investors and speaking on behalf of the Bank to the press.

14.    Defendant R.C. Patel was a founder of Haven Trust and a member of the Board of Directors of Haven Trust and the Bank from 2000 through 2008.  As noted above, R.C. Patel is a co-founder of the Diplomat Hotel Corporation and is the brother of Mukesh Patel.  R.C. Patel resides in Duluth, Georgia.  Throughout the Class Period, R.C. Patel, together with his brother Mukesh Patel, was the public face of Haven Trust, meeting with investors and speaking on behalf of the Bank to the press.

15.    Defendant Edward L. Briscoe ("Briscoe") was President of Haven Trust at relevant times during the Class Period and Chief Executive Officer of the Bank from at least March 2006 through 2008.  Briscoe was also a Director of both Haven Trust and the Bank from at least 2005 through 2008.  Briscoe joined the Bank in May of 2002 and has more than 30 years of experience in the banking industry.  He resides in Lawrenceville, Georgia.

16.    Defendant Scott Dix ("Dix") was a Director of Haven Trust at all relevant times.  He is an attorney and a former member of the Georgia House of Representatives.  He resides in Lilburn, Georgia.

7

17.     Defendant Brij M. Kapoor ("Kapoor") was a Director of Haven Trust and the Bank from 2005 through 2008 and is one of the original organizers, directors and stockholders of the Bank.  Kapoor is an attorney in the Atlanta, Georgia area, practicing principally in the areas of immigration and patent law.  He resides in Atlanta, Georgia.

18.     Defendant Mukund R. "Bobby" Patel ("Mukund Patel") was a Director of Haven Trust and the Bank from at least 2002 through 2008.  Mukund Patel owns and manages hotels and convenience stores.  He resides in Duluth, Georgia.  Mukund Patel personally solicited investments in Haven Trust from Plaintiffs Mukta Patel and Andrea and Phil Boswell.

19.     Defendant Narenda D. "Tony" Patel ("Narenda Patel") was a Director of Haven Trust and the Bank from at least 2002 through 2008.  Narenda Patel owns and manages hotels.  He resides in Acworth, Georgia.

20.     Defendant Dhiru G. "Danny" Patel ("Dhiru Patel") was a Director of Haven Trust and the Bank from at least 2002 through 2008.  Dhiru Patel has an extensive background in hotel construction and management.  He resides in Marietta, Georgia.

8

21.     Defendant Balvant Patel ("Balvant Patel") was a Director of Haven Trust and the Bank from at least 2002 through 2008.  Balvant Patel owns and manages hotels.  He resides in McDonough, Georgia.

22.     All of the Defendants were identified as Directors of Haven Trust in PPMs, discussed below, issued for the purpose of soliciting investors in Haven Trust in both 2006 and 2008.  All consented to this identification, and all had the ability to edit or add to their contents.

23.     The directors of Haven Trust were also the directors of the Bank. Haven Trust shareholders voted to elect directors each year at the Company's annual shareholders' meeting.

24.     In addition to serving as the Chairman of the Board of Directors of Haven Trust and the Bank, defendant Mukesh Patel also served as the chairman of the board of directors of two related banks:  High Trust Bank, located in the Atlanta, Georgia area, and Haven Trust Bank Florida, located in Florida (collectively, they are referred to as the "Affiliate Banks").  Defendants Mukesh Patel, R.C. Patel and Mukund Patel were reportedly investors in the Affiliate Banks.  Additionally, defendants Dhiru Patel and Narenda Patel were reportedly investors in High Trust Bank and defendant Brij Kapoor was reportedly an investor in Haven Trust Bank Florida.

9

25.     Plaintiffs are not related to any of the Defendants.

26.     Non-parties Haven Trust and the Bank are not named as Defendants in this action because, respectively, of the Bankruptcy and receivership.  All of the Defendants were control persons of Haven Trust and the Bank under the federal and Georgia securities statutes.

## IV.   CLASS ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class and the Subclass, consisting of all those who purchased or otherwise acquired the stock of Haven Trust during the Class Period and who were damaged thereby.  Excluded from the Class and Subclass are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class and Subclass ("Class Members") are so numerous that joinder of all members is impracticable.  Haven Trust's petition for Bankruptcy lists over 90 shareholders as of February 24, 2009.  Record owners and other Class Members may be identified from records maintained by the Bankruptcy Court and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

10

29.     Plaintiffs' claims are typical of the claims of the Class Members as all are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

30.     Plaintiffs will fairly and adequately protect the interests of the Class Members and have retained counsel competent and experienced in class, securities and bank litigation.

31.     Common questions of law and fact exist as to all of the Class Members, and predominate over any questions solely affecting individual Class Members.  Among the questions of law and fact common to the Class Members are:

a.     Whether the federal and state securities laws were violated by Defendants' acts as alleged herein;

b.     Whether Defendants during the Class Period omitted to disclose to investors the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices and the Bank's deposit practices;

c.     Whether Defendants participated in and pursued the common course of conduct complained of herein; and

11

d.     Whether the prices paid by Class Members for Haven Trust stock during the Class Period were artificially inflated due to the misrepresentations and omissions complained of herein.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.     FACTS SUPPORTING NON-FRAUD CLAIMS

### A.     Background

33.     Haven Trust was the holding company for the Bank, and had no assets other than the Bank, and no employees other than Bank employees.  The Bank was founded on January 24, 2000 and was based in Duluth, Georgia.  The Bank had four branches in the Atlanta area and additional loan production offices in Birmingham, Alabama and Oklahoma City, Oklahoma.  Its initial focus was on business loans within the Asian-American and Indian communities, especially to hotel and motel operators.  The Bank sold $7 million in stock as of its inception.

12

Its name was originally Horizon Bank and was changed to Haven Trust Bank on December 1, 2005.

34.    The Bank used customer deposits and non-customer deposits to finance loans it originated, principally commercial real estate ("CRE") loans, and with a focus on acquisition, development and construction ("ADC") and hotel/motel lending.

35.    The Bank grew at an average growth rate of over 40 percent per year between 2001 and 2008, with the growth coming in higher-risk CRE and ADC lending.  By 2008, the Bank had approximately $575 million in assets, up from $29 million in assets at the end of its first year of operation in 2000.

36.    However, the Bank's growth, steady dividend payments, and optimistic public statements concerning the Bank's prospects could not turn a failing institution into a successful one.  Reckless lending, often based on incomplete or outdated financial information, lending to commercial real estate developers who put little or no equity of their own into construction projects, and reliance on very high cost funds from brokered deposits led to high loan default rates and an insufficiency of working capital.

37.    On December 17, 2008, the Bank entered into receivership with the FDIC, with the acquiescence of the Defendants.  The FDIC estimated that the cost

13

to the FDIC of insurance for insured accounts at the Bank would exceed $200

million.  The Bank was insufficiently capitalized, was experiencing a high loan

default rate, and by at least September 2008, was no longer viable.  Upon the

receivership of the Bank, stock in Haven Trust became worthless.  Two months

later, the Bank filed for Bankruptcy in this District.

### B.      Operations of the Bank

38.      In August 2009, the Office of Inspector General of the FDIC

completed a "Material Loss Review of Haven Trust Bank," (the "Audit Report") as

it is required to do by Section 38(k) of the Federal Deposit Insurance Act, 12

U.S.C. §1831(k).  This report is attached to this Complaint as Exhibit 2.  The Audit

Report described the history of the Bank and the factors that led to its insolvency

and receivership, presenting a graphic picture, previously unknown to outside

investors, of a poorly managed Bank that favored insiders, did not adhere to

federally mandated or recommended underwriting practices, consistently violated

federal statutes governing it, failed to address critical issues brought to its attention

by regulators, and was on the brink of insolvency by the time of its 2008 stock

offering.  The Audit Report concluded that the Bank's failure was a direct

consequence of Defendants' actions, in their capacity as officers and directors, and

was not caused by the slowdown of the regional real estate economy.

14

39.     The following are descriptions of several such problematic loans the

Bank entered into which were highlighted in the Audit Report but were not timely

disclosed to investors:

a.      In November 2004, the Bank entered into a $5.8 million ADC
        loan related to a retail shopping center in suburban Atlanta,
        Georgia.  Five million dollars of the loan was to fund the
        development costs of the shopping center while the other
        $800,000 was for acquiring the land.   The loan amount was
        subsequently increased to $7.4 million by January 2008,
        exceeding the legal lending limit of $6 million and its $5
        million internal lending limit policy, prompting the Bank to sell
        a portion of the loan to an affiliated bank.  Among other things,
        the loan exceeded the Bank's the loan-to-value ("LTV") ratio of
        the portion of the loan for the acquisition of the land which was
        74 percent, in excess of the *Interagency Guidance on
        Concentrations in Commercial Real Estate Lending* published
        jointly by the FDIC and several other bank regulatory agencies
        in 2006 ("Interagency Guidance"); the borrower only provided
        $369,000 of the $600,000 required at the time of closing; each
        time the Bank increased the principal amount of the loan, the
        Bank replenished the interest reserve -- the use of loan funds to
        pay interest due by the borrower on the outstanding balance of
        the loan -- giving the appearance that loan was current when it
        was not; the Bank removed a loan covenant requiring the
        project to be 50 percent pre-leased before construction could
        begin, as it was only 24 percent pre-leased at the time; almost
        $1 million of interest accrued under the loan's 42 month
        interest reserve; and no principal had been paid on the loan by
        December 31, 2008.  (Audit Report, pp. 14-15)

b.      In 2004, the Bank entered into a $3 million ADC loan with a
        developer related to a 25-acre site for the development of
        residential units.  By the time of closing, the loan was replaced
        with a new $4 million loan and subsequently increased in

15

September 2007 to $5 million.  Interest payments were financed by an estimated 36 month interest reserve.  The loan amount was increased without covenants related to development progress and loan funding, and despite the developer failing to make significant progress.  In March 2009, the FDIC sold the loan for less than half of its book value.  (Audit Report, pp. 15-16)

c.   In June 2007, the Bank entered into a $5.6 million ADC loan renewal relating to the development of 238 townhouses. Among other things, the land acquisition portion of the loan had a LTV ratio of 100 percent, in contravention of the Interagency Guidelines; it appeared that the borrower did not put any hard equity into the project; interest payments were funded using an interest reserve; a $1.3 million loan participation was sold with Haven Trust accepting subordination of principal payments; and as of September 2008, more than 75 percent of the loan, or $4.3 million, had been disbursed despite no construction being started and the project only being one third complete.  (Audit Report, pp. 16-17)

40.   Additionally, the Bank also extended a total of $12 million in loans to Bank "owners and their related interests."  The Audit Report provided a description of four of these loans, which were "adversely classified" by the Georgia DBF "due to inadequate collateral support and repayment capacity of the borrowers":

"[T]he [B]ank originated four loans for $500,000 each to fund the purchase of investment property.  The loans were made to the children of one owner of the [B]ank and were secured by the stock of a sister bank.  The loans were set up as interest only with a 1-year term. These loans had significant underwriting deficiencies, including the following:

16

- Although purportedly made for investment property, the loans were not secured by any investment property, nor were the loan proceeds used to purchase property.

- The children did not have the financial wherewithal to repay the loans, as they all had incomes of less than $20,000.

- The stock used to secure the collateral was not publicly traded, which made it difficult to assess the stock's value.  FDIC liquidation specialists told us that the collateral was likely worthless.

41.    The Audit Report noted that "that the loans were apparently for the benefit of the father"; "[t]he father's financial condition was reported to be financially leveraged, with limited liquidity, and his repayment ability was questionable"; and "Examiners we interviewed commented that these loans could be apparent violations of Regulation O concerning loans to officers, directors, and shareholders."  (Audit Report, p. 11)

42.    A knowledgeable former employee of the Bank stated that a shell holding company nominally owned by R.C. Patel's children received substantial loans in 2008, some over $1 million.  These loans were used to purchase commercial real estate in the area of John's Creek, Georgia; Panama City, Florida; and in Alabama.  One loan also was used to purchase and customize a Maserati for one of R.C. Patel's children.  The children of R.C. Patel had no experience in the

real estate industry and had no interest in the shell company, and had no significant income. These loans were essentially for the benefit of R.C. Patel. The employee did not know whether these were the same loans discussed in the Audit Report.

43. Haven Trust relied on brokered deposits as a source of funds throughout the Class Period. Brokered deposits are certificates of deposit that are marketed to independent brokers who are charged with dividing holdings of wealthy individuals or cash-rich businesses into $100,000 units to enable them to take full advantage of FDIC insurance. Brokered deposits are also known to bank analysts and examiners as "hot money." Unlike consumer deposits, in which there is a relationship between the bank and the consumer and the deposit base therefore remains relatively constant, brokered deposits will quickly move to whichever institution will pay the highest interest rate. Thus, while brokered deposits can help boost liquidity, they also can pose profitability risks. The Audit Report noted that because of its reliance on brokered deposits, Haven Trust's cost of funds between 2005 and 2008 was 93 to 160 basis points higher than that of banks in its peer group. Therefore, many lower risk loans -- which pay lower interest rates -- were unprofitable to Haven Trust.

44. Haven Trust's reliance on brokered deposits also raised an additional material risk for the Bank: absent a waiver from the FDIC, a bank that is classified

18

as less than "well capitalized" may not legally accept brokered deposits.  Thus, the

Bank's financial health would be jeopardized if it ever fell below "well

capitalized."  In fact, the Bank fell below "well capitalized" on several occasions.

### C.   Regulatory Examinations and Other Proceedings

45.   The FDIC's Atlanta Regional Office and the Georgia DBF completed

seven safety and soundness examinations of the Bank between December 2000 and

January 2008.  The FDIC and the Georgia DBF reported the results of the

examinations to the Bank, and therefore the Defendants, in the form of Reports of

Examination ("ROE").  The ROEs were not made available to the investing public.

46.   As part of its June 2005 examination, the FDIC recommended the

following revisions to the Bank's loan policy:

> (1) "An exception report for loans exceeding supervisory LTV
> limitations should be kept and reported to the BOD quarterly.  In
> addition, the policy should be revised to require that the aggregate of
> all loans exceeding the supervisory limitations should not exceed 100
> percent of risk-based capital and that commercial real estate
> exceeding the supervisory limitations should not exceed 30 percent of
> risk-based capital."; (2) "Statutory lending limits for
> unsecured/secured loans to one borrower should be addressed."; (3)
> "The policy should be amended to reflect the bank's current practice
> for loan review."; (4) "Thresholds should be required for financial
> information, i.e., financial statements and tax returns."; and (5) "A
> threshold for industry concentrations should be established at 100
> percent of Tier 1 Capital to coincide with regulatory monitoring."
> (Audit Report, p. 19)

19

47.     As early as June 2005 and continuing through 2008, examiners noted that the Bank had violated certain provisions of Part 365 of Appendix A to the Interagency Guidelines ("Part 365") relating to LTV limits for real estate lending. Each ROE during those years noted that the Bank was not following a provision of Part 365 requiring "that loans with LTV ratios in excess of supervisory LTV limits should be identified in the institution's records and the aggregate amount reported to the BOD at least quarterly."  (Audit Report, p. 9)

48.     The FDIC advised the Bank pursuant to the FDIC's January 2008 examination to improve the Bank's "asset quality, including establishing limits on speculative construction and development loans."   Additionally, the FDIC noted that the Bank's "financial analysis of borrowers was weak" and offered the following recommendation:

> To properly assess the completion status of projects and authorize funds disbursement, management should ensure that collateral inspections are conducted prior to loan disbursements and that appropriate documentation is maintained.  Effective management of risk is dependent on the quality of analysis at origination as well as after the loan is advanced.  Changes in the credit condition or the advancement of additional funds should be documented in credit memorandums, and credit memorandums should be updated at least annually.  Global cash flows, contingent liabilities, interest carries, debt service coverage ratios, as well as strengths and weaknesses also need to be included in credit memorandums.  In addition, when management relies on the borrower's net worth to support the credit, the credit memorandum needs to include management's validation or

verification of the value of real estate and closely-held businesses. (Audit Report, p. 13)

49.    The Audit Report (at p. 10) also noted that the Bank also violated the

following laws and/or regulations between 2004 and 2008:

    a.    Appraisal Independence.  [The Bank] accepted appraisals prepared for someone other than [the Bank], an apparent violation of section 323.5(b)(1) of the FDIC Rules and Regulations.

    b.    Federal Reserve Board Regulation O – Prior Approval.  [The Bank] did not obtain prior approval for extending credit over established thresholds to directors, shareholders, executive officers, or related interests.

    c.    Federal Reserve Board Regulation O.  Three apparent violations of Regulation O in the form of aggregated debt of one director exceeding regulatory limits, a loan for a director being given a favorable interest rate and a director's overdraft exceeding $1,000 for more than 5 consecutive days.

    d.    Directors' Compensation.  An apparent violation of Part 364 of the FDIC Rules and Regulations, in which directors' compensation in 2008 was considered unreasonable and detrimental to the Bank.

    e.    Brokered Deposits.  An apparent violation of Part 337 of the FDIC Rules and Regulations in 2008 and 2005 for accepting brokered deposits while [the Bank] was classified as "Adequately Capitalized" by the FDIC and had not submitted a brokered-deposit application waiver.  Only "well capitalized" banks can legally accept brokered deposits absent a waiver.

    f.    Paying Debt of the Holding Company.  An apparent violation of Federal Reserve Part 23A, regarding servicing the debt of the parent holding company at a time when [the Bank] was prohibited from paying dividends to the holding company without prior approval from the DBF.

21

g.      Dividend Payments without Approval.  An apparent violation of Georgia Banking Rules for paying dividends to the parent holding company while prohibited by the rules and without prior approval of the DBF.

50.     Additionally, the Audit Report found that the Bank had received the following recommendations pursuant to its ROEs:  to improve policies and procedures to ensure compliance with laws and regulations in 2002, 2004, 2005, 2006 and 2008; to improve loan policy and procedures to include appropriate internal controls in 2006 and 2008; to improve the loan review program and/or related watch list in 2008; to improve the audit program and related risk management activities in 2002, 2004, 2005, 2006 and 2008; and to improve loan underwriting and/or credit administration procedures in 2005, 2006 and 2008. (Audit Report, p. 9)

51.     The Bankruptcy Trustee for Haven Trust has asserted that all dividends paid by Haven Trust in January 2008 and later were fraudulent conveyances.  This claim represents an implicit finding by the Trustee, based on examination of internal records of Haven Trust, that Haven Trust was insolvent by January 2008, well before the distribution of the 2008 PPM discussed below.

**D.     The Decline and Failure of the Bank**

52.     On August 12, 2008, the FDIC informed the Bank that it would lower

its capitalization status from "well capitalized" to "adequately capitalized" due to

decreasing capital ratios.  In fact, the Bank had previously been classified as

"adequately capitalized" on several occasions.  Specifically, the FDIC provided

that the Bank's "Total Risk-Based Capital Ratio" had declined to 8.75 percent

based on the bank's June 30, 2008 Reports of Condition and Income (Call Report)

data and, as a result, the bank fell from the "Well Capitalized" category to the

"Adequately Capitalized" category under [Prompt Corrective Action ("PCA")]

provisions."  As a result of this action, the Bank "would therefore have to apply for

a waiver from the FDIC in order to accept or renew brokered deposits."  The Bank

did not seek or receive such a waiver.  (Audit Report, p. 21)

53.     Subsequently, the Bank entered into a Memorandum of

Understanding ("MOU") with the FDIC in September 2008.  The purpose of the

MOU was "[t]o address examination concerns, including apparent violations of

laws and regulations, inadequate risk management controls, and other safety and

soundness issues …."  Among other things, the MOU "required the bank to

formulate and implement a sound lending policy, develop/follow procedures for

effective loan underwriting and credit administration, and monitor and document all loans in excess of supervisory LTV guidelines." (Audit Report, p. 18)

54.    An examination of the Bank was also commenced by the Georgia DBF in September 2008.  A finalized ROE for this examination was not completed before the Bank failed in December 2008.  However, a draft of the 2008 examination report discussed in the Audit Report found significant deterioration in the Bank's condition and determined that the Bank was no longer viable.  The deterioration was due to critical deficiencies in all six components that regulators use to evaluate a bank's performance:  capital asset, asset quality, earnings performance, liquidity position and sensibility to market risk (referred to as "CAMELS").  Each component, and an overall composite score, is assigned a rating of 1 through 5, with 1 having the lowest regulatory concern and 5 having the greatest concern.  The FDIC had assigned the Bank a 3 CAMELS rating in January 2008, and the Georgia DBF was preparing to issue a further downgrade in conjunction with its September 2008 examination.  (Audit Report, p. 18)

55.    On November 17, 2008, the FDIC informed the Bank that due to further decreases in certain of its capital rations -- specifically, its Tier 1 Leverage Capital Ratio, Tier 1 Risk-Based Capital Ratio and Total Risk-Based Capital Ratio -- as of September 30, 2008, it was "undercapitalized."  As a result of this action,

the Bank was "subject to restrictions on asset growth, dividends, other capital distributions, and management fees pursuant to section 38(d) of the FDI Act." (Audit Report, pp. 21-22)

56.     On December 10, 2008, a resolution was passed by Defendants to place the Bank into receivership.  On December 12, 2008, the Bank entered into receivership with the FDIC.  (Audit Report, p. 4)  In a letter to Haven Trust shareholders on that same day, defendant Mukesh Patel explained the fate of the Bank:

> In the end, our Regulatory Authorities concluded that our excessive volume of nonperforming loans, centered in real estate development lending in what has become one of the weakest real estate markets this country has ever experienced, was simply too much for the Bank to overcome given its decreasing capital level, and that the prospects for a private investment, merger or even acquisition solution were not readily forthcoming.

57.     On January 5, 2009, the FDIC notified the Office of Inspector General that at the time of closing, the Bank had assets of $572 million and total deposits of $515 million.  The FDIC estimated that the material loss to the Deposit Insurance Fund would be about $207 million.  BB&T acquired the deposits and the Bank's four branch offices for $112,000, and also acquired some other Bank assets.

**E.**   **The Defendants' Responsibility for the Bank's and Haven Trust's Failure**

58.   The Audit Report concluded that the Defendants, in their capacity as

directors, were the cause of the bank failure:

> The key cause of failure of the institution was that its BOD [Board of Directors] did not adequately identify, measure, monitor, and control risk in its loan portfolio.  Bank management pursued an aggressive loan growth strategy concentrated in high-risk CRE [Commercial Real Estate] construction and development loans with poor loan underwriting and funded by high-cost deposits and borrowings. Because the majority of CRE in the bank's portfolio was originated with weak underwriting, such as little or no borrower equity in the project, much of the risk associated with the loan portfolio tended to rest with the bank rather than the borrower.  As a result, the combination of the concentration of CRE and poor underwriting made the bank vulnerable to fluctuations in the real estate market, and when that market declined, the bank's loan portfolio became significantly impaired.  By and large, bank management ignored the increasing risks of the bank's loan originations and failed to address examiner concerns or take appropriate steps to manage those risks.  (Audit Report, pp. 4-5)

*****

> Management's lack of oversight and failure to control risk led to substantial losses and capital and liquidity erosion that accelerated the bank's deterioration and eventual failure.  (Audit Report, p. 5)

59.   The Audit Report also concluded that the Bank had failed to take

action by December 1, 2008 in order to comply with the terms of the September

2008 MOU.  (Audit Report, p. 27)

26

**F.**     **Securities Offerings and False Statements**

60.     Haven Trust stock was offered to investors on several occasions during the Class Period. Each offering was conducted pursuant to a PPM. Plaintiffs Ashok Parekh and Jitu Patel participated in the 2006 Offering; and Lead Plaintiff Mukta Patel and Plaintiffs Andrea and Phil Boswell participated in the 2008 Offering.

**1.**     **The 2006 Offering**

61.     According to the PPM for the 2006 Offering, dated March 31, 2006 ("2006 PPM"), the offering consisted of up to 400,000 shares of Haven Trust stock; the shares would be offered for $25 per share; Haven Trust's "executive officers and directors [would] make offers and sales of the common stock on behalf of" the Company; and any questions regarding the offering were referred to defendant Edward Briscoe. The 2006 Offering was open until at least December 31, 2006.

62.     The 2006 PPM contained the following description of the Bank's lending policies:

**Lending Services**

   ***Lending Policy.*** We place a primary emphasis on real estate related loans in order to take advantage of the population growth in our primary service area. We also offer a full range of lending

27

products, including commercial loans to small- to medium-sized businesses and professional concerns, and consumer loans to individuals.  We compete for these loans with competitors who are well established in our primary service area and have greater resources and lending limits.  As a result, we may have to offer more flexible pricing and terms to attract borrowers.

Haven Trust Bank's loan portfolio is comprised of the following:

| **Loan Category** | **Percentage** |
|---|---|
| Real estate-related loans | 70.2% |
| Commercial loans | 27.8% |
| Consumer loans | 2.0% |

We believe that, when properly managed and monitored, none of these categories represents a significantly higher risk than the other.

*Loan Approval, Review, and Lending Limits.*  Haven Trust Bank has an internal loan limit of $3 million.  All loans when the total exposure exceeds $400,000 are presented for approval to the Directors Loan Committee.  This Committee meets weekly.  To provide for a timely response to our customers loan needs, loans up to $2 million can be approved with the concurrence of two members of Senior Management and two members of the Directors Loan Committee, and then reported to the full Directors Loan Committee.

*Credit Risks.*  The principal economic risk associated with each category of loans that Haven Trust Bank makes is the creditworthiness of the borrower.  Borrower creditworthiness is affected by general economic conditions and the strength of the relevant business market segment.  General economic factors affecting a borrower's ability to repay include interest, inflation and employment rates, as well as other factors affecting a borrower's customers, suppliers and employees.

28

> The well established financial institutions in our primary
> service market make proportionately more loans to medium- to large-
> sized businesses than Haven Trust Bank makes.  Many of Haven Trust
> Bank's commercial loans are made to small- to medium-sized
> businesses that may be less able to withstand competitive, economic
> and financial pressures than larger borrowers.  (2006 PPM, pp. 15-16)

63.     The statement "[the Bank] has an internal loan limit of $3 million"

was materially misleading in its omissions.  The Audit Report noted that the Bank

had extended $5.8 million in November 2004 to one developer to acquire property

and develop a retail shopping center, and in November 2005 replaced an existing

loan for $3 million to another developer with a $4 million loan.  Haven Trust's

failure to adhere to its own lending limits policy, if known, was material to

investors for two reasons:  first, it increased the risk that a small number of

borrower failures could jeopardize the Bank; and second, it called into question the

adequacy of the Bank's internal controls.

64.     The statement that "when properly managed and monitored none of

these categories represents a significantly higher risk than the other" was

materially misleading in its omissions.  First, Haven Trust's portfolio was <u>not</u>

properly managed and monitored, as discussed above.  Second, Haven Trust's real

estate and commercial loans <u>both</u> represented unreasonable risks of default because

of the Bank's deficient approval process.

29

65.     The discussion of credit risks was materially misleading because it omitted any mention of the greatest risk associated with real estate loans: inadequate value of collateral.  Where a property's value falls below the outstanding value of the loan, a commercial real estate borrower has a strong incentive to default on payment even if it is creditworthy.  Haven Trust's practice of extending loans with a loan-to-value ratio as high as 100% made it exceptionally vulnerable to such strategic defaults.  The 2006 PPM was also misleading because it made no mention of the dubious loan practices enumerated in ¶¶ 39-40 above, which made default exceptionally likely.

66.     Additionally, the 2006 PPM provided that the board of directors of Haven Trust and the Bank had established the following board committees, among others:  Executive Committee; Audit and Compliance Committee; Asset/Liability Committee; and Loan Committee.  The following are descriptions of the responsibilities of each committee:

> **Executive Committee.**  The Executive Committee, between meetings of the board of directors, performs all duties and exercises all authority of the board except for those duties and authorities specifically granted to other committees of the board or which are exclusively reserved to the full board.  The committee makes recommendations to the board regarding matters that are important to the overall management and expansion of Haven Trust Bancorp and Haven Trust Bank, including annual budgets and strategic business plans.  Additionally, this committee is responsible for recommending

30

nominations for the expired board seats and additional board members.  (2006 PPM, p. 36)

*Audit and Compliance Committee.*  The principal responsibilities of this committee are to ensure that the board receives objective information regarding policies, procedures and controls of Haven Trust Bancorp and Haven Trust Bank with respect to auditing, accounting, internal accounting controls and financial reporting.  The committee also works to ensure that Haven Trust Bancorp and Haven Trust Bank are in compliance with applicable laws and regulations. Among other things, this requires the following:

- recommending the appointment of an independent auditor on an annual basis;

- reviewing the independent auditors' report and management's response;

- reviewing all reports from regulatory authorities and management's response;

- establishing independent reviews and audits;

- establishing appropriate levels of director and officer insurance and blanket bond insurance coverage; and

- reviewing Community Reinvestment Act and other regulatory compliance.  (2006 PPM, p. 36)

*Asset/Liability Committee.*  The Asset/Liability Committee is also responsible for the overall investment strategy of Haven Trust Bank.  This responsibility includes liquidity management, risk management, net interest margin management, monitoring deposit level trends and pricing, monitoring asset level trends and pricing, and portfolio investment decisions.  (2006 PPM, p. 36)

31

*Loan Committee.*  The Loan Committee is responsible for establishing or approving, in conjunction with management, all major policies and procedures pertaining to loan policy, including:

- establishing the loan approval system;

- approving all loans in excess of a predetermined amount;

- reviewing all past due reports, rated loan reports, non-accrual reports, reports and other reports and indicators of overall loan portfolio quality;

- establishing all policies pertaining to credit, loan review and risk management;

- establishing measurements for adequacy of the loan loss reserve; and

- reviewing any other matters pertaining to the loan portfolio such as yield and concentrations.  (2006 PPM, pp. 36-37)

67.    This description of the Loan Committee's control over loan approval process at the Bank in the 2006 PPM was materially misleading in its omissions, as the Audit Report explained.  In particular, the Bank's loan policies were inadequate for the type of lending it engaged in.  Although the 2006 PPM claimed that the Loan Committee had established policies pertaining to credit, loan review and risk management, the Bank had no written policies addressing risk diversification and limits for CRE and ADC loans; the use of interest reserves for construction costs; required equity contributions by borrowers; or limits on

32

speculative development and construction loans.  The Bank did not adhere to these

processes in extending all loans during the Class Period.

68.    The 2006 PPM also contained a description of the FDIC's regulatory

program as it related to the Bank:

**Haven Trust Bank**

Haven Trust Bank is a state-chartered bank insured by the
FDIC and is not a member of the Federal Reserve.  As such, Haven
Trust Bank is subject to supervision and regulation by the FDIC and
the Department.  Supervision, regulation and examination of banks by
regulatory agencies are intended primarily for the protection of
depositors rather than stockholders of the banks.  (2006 PPM, p. 25)

***Prompt Corrective Action:***  The Federal Deposit Insurance
Corporation Improvement Act of 1991 establishes a system of prompt
corrective action to resolve the problems of undercapitalized financial
institutions.  Under this system, the federal banking regulators have
established five capital categories (well capitalized, adequately
capitalized, undercapitalized, significantly undercapitalized and
critically undercapitalized) in which all institutions are placed.
Federal banking regulators are required to take various mandatory
supervisory actions and are authorized to take other discretionary
actions with respect to institutions in the three undercapitalized
categories.  The severity of the action depends upon the capital
category in which the institution is placed.  Generally, subject to a
narrow exception, the banking regulator must appoint a receiver or
conservator for an institution that is critically undercapitalized.  The
federal banking agencies have specified by regulation the relevant
capital level for each category.

An institution that is categorized as undercapitalized,
significantly undercapitalized, or critically undercapitalized is
required to submit an acceptable capital restoration plan to its

33

appropriate federal banking agency.  A bank holding company must guarantee that a subsidiary depository institution meets its capital restoration plan, subject to various limitations.  The controlling holding company's obligation to fund a capital restoration plan is limited to the lesser of 5% of an undercapitalized subsidiary's assets at the time it became undercapitalized or the amount required to meet regulatory capital requirements.  An undercapitalized institution is also generally prohibited from increasing its average total assets, making acquisitions, establishing any branches or engaging in any new line of business, except under an accepted capital restoration plan or with FDIC approval.  The regulations also establish procedures for downgrading an institution to a lower capital category based on supervisory factors other than capital.  (2006 PPM, pp. 25-26)

*FDIC Insurance Assessments.*  The FDIC has adopted a risk-based assessment system for insured depository institutions that takes into account the risks attributable to difference categories and concentrations of assets and liabilities.  The system assigns an institution to one of three capital categories:  (1) well capitalized; (2) adequately capitalized; and (3) undercapitalized.  These three categories are substantially similar to the prompt corrective action categories described above, with the "undercapitalized" category including institutions that are undercapitalized, significantly undercapitalized, and critically undercapitalized for prompt corrective action purposes.  The FDIC also assigns an institution to one of three supervisory subgroups based on a supervisory evaluation that the institution's primary federal regulator provides to the FDIC and information that the FDIC determines to be relevant to the institution's financial condition and the risk posed to the deposit insurance funds.  Assessments range from 0 to 27 cents per $100 of deposits, depending on the institution's capital group and supervisory subgroup.  In addition, the FDIC imposes assessments to help pay off the $780 million in annual interest payments on the $8 billion Financing Corporation bonds issued in the late 1980s as part of the government rescue of the thrift industry.  This assessment rate is adjusted quarterly.

The FDIC may terminate its insurance of deposits if it finds that the institution has engaged in unsafe and unsound practices, is in an unsafe or unsound condition to continue operations, or has violated any applicable law, regulation, rule, order or condition imposed by the FDIC.  (2006 PPM, pp. 25-26)

69.     The 2006 PPM discussion of the regulation of the Bank was

materially misleading because it omitted any mention of the deficiencies the FDIC

or the Georgia DBF had noted in examinations prior to 2006.  These deficiences

included, among others:

- Apparent violations related to insider, affiliate, or Bank Secrecy Act violations;

- Apparent violations related to loan underwriting and/or credit administration;

- Inadequate loan policies; and

- Inadequate loan underwriting and/or credit administration procedures.

The 2006 PPM was also misleading because it failed to disclose that the Bank's

management was warned of each of these concerns by the FDIC or the Georgia

DBF, in some cases as early as 2002, but had failed to address them.

70.     The lengthy description of the regulatory process, without any

mention that the regulators had already found Haven Trust's procedures to be

35

inadequate, was materially misleading in its omissions.  According to the Audit

Report, the examiners at the 2005 examination recommended:

- An exception report for loans exceeding supervisory LTV limitations should be kept and reported to the BOD quarterly. In addition, the policy should be revised to require that the aggregate of all loans exceeding the supervisory limitations should not exceed 100 percent of risk-based capital and that commercial real estate exceeding the supervisory limitations should not exceed 30 percent of risk-based capital.

- Statutory lending limits for unsecured/secured loans to one borrower should be addressed.

- The policy should be amended to reflect the bank's current practice for loan review.

- Thresholds should be required for financial information, i.e., financial statements and tax returns.

- A threshold for industry concentrations should be established at 100 percent of Tier 1 Capital to coincide with regulatory monitoring.  (Audit Report, p. 19)

71.     The description of the Bank's regulatory status, taken as a whole, was

materially misleading for its omission of the fact that in 2005 the Bank had failed

to maintain a regulatory status of "well capitalized," and instead was classified as

"adequately capitalized."  This was critically important to the Bank because

without either a "well capitalized" classification or a waiver from the FDIC (which

it did not have), the Bank could not legally accept brokered deposits.  However, it continued to accept brokered deposits, in violation of FDIC regulations.

72.    Plaintiffs Jitu Patel and Ashok Parekh purchased, respectively, 3,000 shares for $75,000 and 4,000 shares for $100,000 pursuant to this 2006 Offering.

## 2.   The 2008 Offering

73.    Defendants explored offering additional Haven Trust stock to investors in early May of 2008.  On May 8, 2008, defendant Mukesh Patel sent existing investors of Haven Trust a letter entitled "Expression of Interest."  The letter provided that the banks were seeking "additional capital in order to either purchase assets or the outright acquisition(s) of other financial institution(s)"; that because the banks "are being operated as a Subchapter S Corporation, it would require most of any additional capital to come from existing shareholders, and/or relatives or from a few new Shareholders who agree to large investments …."; and "[i]t is estimated that in order to proceed with pursuing some target banks, that an additional Forty Million ($40,000,000.00) in new capital may be required."

74.    Potential investors during this period were provided an updated PPM, which was dated March 31, 2008.  This document contained a description of the purported business practices of the Bank:

37

## Lending Services

***Lending Policy.***  We place a primary emphasis on real estate related loans in order to take advantage of the population growth in our primary service area.  We also offer a full range of lending products, including commercial loans to small- to medium-sized businesses and professional concerns, and consumer loans to individuals.  We compete for these loans with competitors who are well established in our primary service area and have greater resources and lending limits.  As a result, we may have to offer more flexible pricing and terms to attract borrowers.

Haven Trust Bank's loan portfolio is comprised of the following:

| **Loan Category** | **Percentage** |
| --- | --- |
| Real estate-related loans | 73.0% |
| Commercial loans | 25.4% |
| Consumer loans | 1.6% |

We believe that, when properly managed and monitored, none of these categories represents a significantly higher risk than the other. (2008 PPM, p. 26)

***Loan Approval, Review, and Lending Limits.***  Haven Trust Bank has an internal loan limit of $5 million.  All loans when the total exposure exceeds $400,000 are presented for approval to the Directors Loan Committee.  This Committee meets weekly.  To provide for a timely response to our customers loan needs, loans up to $2 million can be approved with the concurrence of two members of Senior Management and two members of the Directors Loan Committee, and then reported to the full Directors Loan Committee.  (2008 PPM, p. 21)

*Credit Risks.*  The principal economic risk associated with each category of loans that Haven Trust Bank makes is the creditworthiness of the borrower.  Borrower creditworthiness is affected by general economic conditions and the strength of the relevant business market segment.  General economic factors affecting a borrower's ability to repay include interest, inflation and employment rates, as well as other factors affecting a borrower's customers, suppliers and employees.

Larger and potentially more established financial institutions in our primary service market make proportionately more loans to medium- to large-sized businesses than Haven Trust Bank.  Many of Haven Trust Bank's commercial loans are made to small- to medium-sized businesses that may be less able to withstand competitive, economic and financial pressures than large borrowers.  (2008 PPM, p. 21)

*Real Estate Loans.*  The largest portion of Haven Trust Bank's loan portfolio is comprised of real estate loans.  Haven Trust Bank makes loans secured by commercial real estate, construction and development loans, and residential real estate loans.  The terms of the loans vary by purpose, size and by type of underlying collateral. (2008 PPM, p. 21)

75.    For the reasons discussed in ¶ 63 above, these statements were

materially misleading in its omissions.  In particular, the Bank violated limits,

made excessively risky loans undertaken with deficient underwriting, and did not

adhere to the Bank's stated policies, all as set forth above.  Moreover, by 2008, the

Bank's circumstances had grown more dire.  A January 2008 examination by the

FDIC found that all of the areas of concern noted in ¶ 50 remained uncorrected,

and new problems had arisen:  by the time of the January 2008 audit, the examiner

39

also noted higher risks associated with concentration in brokered or out-of-territory loans; an inadequate loan review program; and a need to improve loan policy and procedures to include appropriate internal controls.

76.     The statement that "Haven Trust Bank has an internal loan limit of $5 million" was materially misleading in its omissions. As disclosed in the Audit Report, in January 2007 the Bank financed a $5.6 million 238-townhouse-development project. Aside from violating the published loan limit, the loan process was deficient because 100% of the land acquisition was financed with the developer apparently putting no money in. The Bank lent another borrower $7.3 million to acquire a property for $6.5 million, both violating the purported internal lending limit and violating federal guidelines by financing a property for more than 100% of its value.

77.     The 2008 PPM contained the following description of the committees, and responsibilities of committees of the Board of Directors:

**Board Committees**

The boards of directors of Haven Trust Bancorp and Haven Trust Bank have established the committees described below (2008 PPM, p. 39):

***Executive Committee.*** The Executive Committee, between meetings of the board of directors, performs all duties and exercises all authority of the board except for those duties and authorities

40

specifically granted to other committees of the board or which are exclusively reserved to the full board.  The committee makes recommendations to the board regarding matters that are important to the overall management and expansion of Haven Trust Bancorp and Haven Trust Bank, including annual budgets and strategic business plans.  Additionally, this committee is responsible for recommending nominations for the expired board seats and additional board members.  (2008 PPM, pp. 39-40)

*Audit and Compliance Committee.*  The principal responsibilities of this committee are to ensure that the board receives objective information regarding policies, procedures and controls of Haven Trust Bancorp and Haven Trust Bank with respect to auditing, accounting, internal accounting controls and financial reporting.  The committee also works to ensure that Haven Trust Bancorp and Haven Trust Bank are in compliance with applicable laws and regulations.  Among other things, this requires the following:

- recommending the appointment of an independent auditor on an annual basis;

- reviewing the independent auditors' report and management's response;

- reviewing all reports from regulatory authorities and management's response;

- establishing independent reviews and audits;

- establishing appropriate levels of director and officer insurance and blanket bond insurance coverage; and

- reviewing Community Reinvestment Act and other regulatory compliance.  (2008 PPM, p. 40)

41

*Asset/Liability Committee.*  The Asset/Liability Committee is also responsible for the overall investment strategy of Haven Trust Bank.  This responsibility includes liquidity management, risk management, net interest margin management, monitoring deposit level trends and pricing, monitoring asset level trends and pricing, and portfolio investment decisions.  (2008 PPM, p. 40)

*Loan Committee.*  The Loan Committee is responsible for establishing or approving, in conjunction with management, all major policies and procedures pertaining to loan policy, including:

- establishing the loan approval system;

- approving all loans in excess of a predetermined amount;

- reviewing all past due reports, rated loan reports, non-accrual reports, reports and other reports and indicators of overall loan portfolio quality;

- establishing all policies pertaining to credit, loan review and risk management;

- establishing measurements for adequacy of the loan loss reserve; and

- reviewing any other matters pertaining to the loan portfolio such as yield and concentrations.  (2008 PPM, p. 40)

78.     This description of the loan approval process at the Bank in the 2008 PPM was materially misleading for the reasons stated in ¶ 40 above.  The description of the role of the Loan Committee also was misleading because it understated its role in this period.  The Loan Committee dictated the terms of

42

loans, overriding the Bank's staff to make terms more lenient to favored

borrowers.  According to a knowledgeable former employee of the Bank, in one

instance, the Loan Committee directed that the Bank accept pledges of $1 million

in shares of an Affiliate Bank, High Trust, as collateral.  In fact, the pledged shares

were never delivered, and the Loan Committee directed that a letter from the

President of High Bank be accepted as adequate assurance of collateral.

79.     The 2008 PPM also included a generic description of the FDIC's

regulatory authority:

> ***Prompt Corrective Action.***  The Federal Deposit Insurance
> Corporation Improvement Act of 1991 establishes a system of prompt
> corrective action to resolve the problems of undercapitalized financial
> institutions.  Under this system, the federal banking regulators have
> established five capital categories (well capitalized, adequately
> capitalized, undercapitalized, significantly undercapitalized and
> critically undercapitalized) in which all institutions are placed.
> Federal banking regulators are required to take various mandatory
> supervisory actions and are authorized to take other discretionary
> actions with respect to institutions in the three undercapitalized
> categories.  The severity of the action depends upon the capital
> category in which the institution is placed.  Generally, subject to a
> narrow exception, the banking regulator must appoint a receiver or
> conservator for an institution that is critically undercapitalized.  The
> federal banking agencies have specified by regulation the relevant
> capital level for each category.  As of May 31, 2008 the Bank
> qualified for the adequately capitalized category.
>
> An institution that is categorized as undercapitalized,
> significantly undercapitalized, or critically undercapitalized is
> required to submit an acceptable capital restoration plan to its

43

appropriate federal banking agency.  A bank holding company must guarantee that a subsidiary depository institution meets its capital restoration plan, subject to various limitations.  The controlling holding company's obligation to fund a capital restoration plan is limited to the lesser of 5% of an undercapitalized subsidiary's assets at the time it became undercapitalized or the amount required to meet regulatory capital requirements.  An undercapitalized institution is also generally prohibited from increasing its average total assets, making acquisitions, establishing any branches or engaging in any new line of business, except under an accepted capital restoration plan or with FDIC approval.  The regulations also establish procedures for downgrading an institution to a lower capital category based on supervisory factors other than capital.  (2008 PPM, p. 30)

*FDIC Insurance Assessments.*  The FDIC has adopted a risk-based assessment system for insured depository institutions that takes into account the risks attributable to difference categories and concentrations of assets and liabilities.  The system assigns an institution to one of three capital categories:  (1) well capitalized; (2) adequately capitalized; and (3) undercapitalized.  These three categories are substantially similar to the prompt corrective action categories described above, with the "undercapitalized" category including institutions that are undercapitalized, significantly undercapitalized, and critically undercapitalized for prompt corrective action purposes.  The FDIC also assigns an institution to one of three supervisory subgroups based on a supervisory evaluation that the institution's primary federal regulator provides to the FDIC and information that the FDIC determines to be relevant to the institution's financial condition and the risk posed to the deposit insurance funds.

The FDIC may terminate its insurance of deposits if it finds that the institution has engaged in unsafe and unsound practices, is in an unsafe or unsound condition to continue operations, or has violated any applicable law, regulation, rule, order or condition imposed by the FDIC.  (2008 PPM, pp. 30-31)

44

80.     The description of the Bank as "adequately capitalized," followed by a lengthy discussion of the regulatory consequences of a bank being classified as "undercapitalized," was materially misleading because it omitted any discussion of the adverse regulatory consequences to Haven Trust of the "adequately capitalized" rating.  As explained above, a bank that is "adequately capitalized" cannot accept brokered deposits, which Haven Trust relied upon as a significant source of funds.  Haven Trust had not sought a waiver to continue to accept brokered deposits.  Absent either a waiver or a classification as "well capitalized," Haven Trust's continued acquisitions of brokered deposits put it in material non-compliance with federal regulations.  This resulted in a PCA letter from the FDIC in August 2008.

81.     The description of the FDIC regulations as a whole was materially misleading because it omitted any discussion of the actions the FDIC had already taken as regulator of the Bank, all as described above and all of which were material to investors.  The FDIC and state regulatory actions prior to the 2006 PPM are described in ¶¶ 45-49 above.  None of the deficiencies identified at that time had been remedied by 2008.  The January 2008 report from the FDIC's examination "stated that the level of concentrations posed extreme risk to the bank's capital and earnings and required heightened oversight from the Board of

Directors and senior management."  This report led to the FDIC imposing a

Memorandum of Understanding on the Bank in September 2008, requiring the

Bank "to formalize and implement a sound lending policy, develop/follow

procedures for affective loan underwriting and credit administration, and monitor

and document all loans in excess of supervisory [loan-to-value] guidelines."

82.    The 2008 PPM stated:

> Consistent with supervisory guidance, the Bank maintains a prudent
> and conservative, but not excessive, ALLL [Allowance for Loan and
> Lease Losses], that is at a level appropriate to cover estimated credit
> losses on individually evaluated loans determined to be impaired as
> well as estimated credit losses in the remainder of the loan and lease
> portfolio.  The Bank's estimate of credit losses reflects consideration
> of all significant factors that affect the collectability of the portfolio as
> of the evaluation date.  (2008 PPM, p. 31)

83.    This statement was materially misleading.  According to the Audit

Report, the Bank had failed to incorporate the current ALLL methodology into its

loan policy.

84.    The 2008 PPM also was materially misleading because it failed to

disclose that by 2008, according to a former Bank employee knowledgeable of the

process for extending loans, Haven Trust had in practice adopted a policy of never

charging off delinquent commercial loans, but instead restructuring or granting six-

month extension loans to avoid recording an asset writedown, a practice known as

"Amend and Pretend" loans in the industry.  Frequently such extensions would add late penalties and interest owed into a new, higher, principal amount, without any money collected from the borrower.  Also, loan extensions were routinely granted without up-to-date financial information from borrowers.  The refinancings were often in violation of the Bank's own policies and applicable regulations.

85.     The 2008 PPM, taken as a whole, was also materially misleading for its failure to disclose that examination of Haven Trust's business records would reveal that Haven Trust was insolvent by January 2008, as the Bankruptcy Trustee subsequently determined.

86.     Later in 2008, defendants Mukesh Patel and R.C. Patel held at least two "road show" presentations for existing and potential investors in order to solicit additional purchases of Haven Trust stock.  The presentations took place, respectively, in the Atlanta area -- one at the BAPS Shri Swaminarayan Mandir Hindu temple, and the other at an Indian restaurant.  Defendants Mukesh Patel and R.C. Patel told investors that Haven Trust stock was a great investment opportunity.  However, these Defendants failed to disclose the truth concerning the Bank's deficient lending practices and reliance on brokered deposits that it could not legally accept.  Additional Haven Trust shares were reportedly offered at $25 per share.

47

87.     Haven Trust also announced a 2-for-1 stock split effective

September 10, 2008, in a further attempt to suggest that the Bank was in a strong

financial position.

88.     In September 2008, defendants Mukesh Patel and R.C. Patel solicited

an investment in the stock of Haven Trust from Lead Plaintiff Mukta Patel and her

husband.  Defendants Mukesh Patel and R.C. Patel again described the investment

as safe.  Lead Plaintiff Mukta Patel purchased 4,000 shares for $100,000.  Also in

September 2008, Plaintiffs Andrea and Phil Boswell purchased 1,000 shares for

$25,000.

## VI.   <u>LOSS CAUSATION</u>

89.     The practices misrepresented and omitted from the 2006 PPM and

2008 PPM, which Defendants had a legal duty to disclose, caused Plaintiffs'

damage.  Haven Trust stock, which had been acquired by Plaintiffs at $25/share as

late as September 2008, lost all of its value upon the announcement of the FDIC

takeover of the Bank.  The Audit Report concludes, "Haven failed due to bank

management's lack of oversight and failure to control risk in its loan portfolio,"

coupled with reliance on brokered deposits for funding.  The material

misrepresentations and omissions relate specifically to failures to control known

48

risks in the lending policy, as well as reliance on high cost funds from brokered deposits which the Bank could not legally accept.

## COUNT I

## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF THE GEORGIA SECURITIES ACT OF 1973

90.     This count is brought on behalf of the Subclass against all Defendants to enforce liability created by O.C.G.A. § 10-5-12 of the Georgia Securities Act of 1973.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

91.     O.C.G.A. § 10-5-12(a) of the Georgia Securities Act of 1973 makes it unlawful, in connection with the offer, purchase, or sale of a security to make a material omission.

92.     Defendants Mukesh Patel, R.C. Patel and Briscoe, as previously outlined, made one or more material omissions with respect to the sale of securities to Plaintiffs and other Subclass Members.  As a result, the Subclass Members suffered great economic harm as a consequence of the Defendants' actions.

93.     O.C.G.A. § 10-5-14(c) makes each Defendant liable as a "control person" because each was an "executive officer or director" of Haven Trust at the time the material omissions occurred.

94.     Defendants Mukesh Patel, R.C. Patel and Briscoe's violations of the Georgia Securities Act of 1973 not only caused the Subclass Plaintiffs to purchase the securities, those violations also caused the Subclass Plaintiffs and other Class Members to lose large sums of money.

95.     This action is brought within the time permitted by law.

## COUNT II

## CLAIM FOR RESCISSION AGAINST ALL DEFENDANTS FOR VIOLATIONS OF THE GEORGIA SECURITIES ACT OF 1973

96.     This count is brought on behalf of the Subclass against all Defendants to enforce liability created by O.C.G.A. §§ 10-5-12 and 10-5-14 of the Georgia Securities Act of 1973.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

97.     The offer to sell investments in Haven Trust by defendants through the PPM and the purchase of same by Plaintiffs and other Class Members

50

constitute the offer and sale of securities within the meaning of the Georgia

Securities Act of 1973,  O.C.G.A. § 10-5-12, et seq.

98.    The foregoing material omissions by the Defendants constitute

violations of O.C.G.A. § 10-5-12 of the Georgia Securities Act of 1973, and the

defendants are jointly and severally liable to each Class Member for each

transaction involving the investments in which they participated pursuant to

O.C.G.A. § 10-5-14 of the Georgia Securities Act of 1973.

99.    O.C.G.A. § 10-5-14(c) makes all Defendants each liable as a "control

person" because each was an "executive officer or director" of Haven Trust and of

the Bank at the time the material omissions occurred.

100.   Plaintiffs and other Class Members are each entitled to complete

rescission of their respective purchases and to a return of their entire investment,

and any other damages to be proved at trial, plus interest from the date of each

investment, and their costs and expenses, including reasonable attorney's fees.

101.   This action is brought within the time permitted by law.

## COUNT III

## AGAINST ALL DEFENDANTS FOR NEGLIGENT MISREPRESENTATION AND OMISSION

102.   This Count is brought on behalf of all Class Members against all Defendants to enforce liability created under Georgia law.

103.   As set forth above, the Defendants breached their legal duty to provide accurate information to each Class Member as prospective purchasers of investments in Haven Trust by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

104.   By reason of the aforesaid, the Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in Haven Trust.

105.   By reason of the aforesaid, the Defendants are liable, jointly and severally, for negligence to each Class Member pursuant to applicable Georgia law, including without limitation, O.C.G.A. §§ 51-1-6 and 51-1-8, for the full price paid for shares purchased by the Plaintiffs and other Class Members with interest thereon from the date of payments, and all other damages allowed by law.

106.   This action is brought within the time permitted by law.

## VII.    ADDITIONAL FACTS SUPPORTING FRAUD CLAIMS

107.   There are several additional facts that support Plaintiffs' fraud-based claims against defendants Mukesh Patel, R.C. Patel and Briscoe (the "Fraud Defendants").  These allegations are not part of the complaint alleging violations of the Georgia securities laws and the common law, for which scienter is not an element of the claim.  More particularly, these additional facts provide evidence reflecting that the Fraud Defendants -- who controlled the Bank as both directors and officers of Haven Trust and/or the Bank -- acted either intentionally or in reckless disregard of the interests of the Plaintiffs and other Class Members.

108.   First, the Bank pursued excessively risky lending practices.  The Bank extended highly speculative and risky CRE and ADC loans to borrowers.  The Bank's poor loan underwriting and lack of risk management controls combined with loans concentrated in high-risk CRE and ADC made the Bank particularly vulnerable to any downturn in the real estate market.

109.   For example, the Bank's excessively risky lending practices were underscored by the Bank's nine loans totaling $12 million to Bank "owners and their related interests."  In particular, the four loans made to adult children of one of Haven Trust's founders in May 2008 were excessively risky and represented self-dealing.  Among other things, they were interest only loans maturing in one

53

year; they were purportedly to fund the purchase of investment property, although they were not actually used for that purpose; they were purportedly secured by stock in a related bank, but the Bank had not obtained the applicable stock certificates; the value of the collateral stock could not easily be determined because it was not publicly traded; and the borrowers were students with incomes of less $20,000 and lacked the ability to repay the loans.  Most significantly, the loans were apparently a disguised loan to the children's father, who was heavily leveraged.  The father's repayment ability was questionable, but he was allowed to personally guarantee the loans.

110.   The loans to a shell corporation nominally controlled by Defendant R.C. Patel's children, but actually extended to R.C. Patel, are further evidence that R.C. Patel was aware of improper practices at the Bank at the time he was soliciting investors for the 2008 Offering.

111.   Additionally, the Fraud Defendants were aware of laws and regulations relating to loan underwriting deficiencies, among other things, that the Bank had violated throughout the Class Period.  Along these lines, the Fraud Defendants received repeated recommendations from the FDIC and the Georgia DBF regarding the Bank's deficiencies but failed to take appropriate action.  In

particular, the Fraud Defendants failed to take appropriate action in response to the FDIC's January 2008 examination and the September 2008 MOU.

112.   Knowingly or recklessly, the Fraud Defendants sought -- successfully, at least in part -- to raise additional capital from investors late in the Class Period knowing or disregarding, among other things, that the Bank failed to implement recommendations from the FDIC and Georgia DBF regarding its excessively risky lending practices; that the Bank continued to extend or renew excessively risky CRE loans; and that the Bank's capitalization status had been downgraded.  In all communications with investors, the Fraud Defendants omitted such highly material facts.

113.   The Fraud Defendants were also aware that the Bank could not legally accept brokered deposits, because the FDIC classified the Bank as "adequately capitalized" and not "well capitalized," in both 2005 and 2008, and the Bank had not applied for a waiver required by the FDIC.  Indeed, their knowledge of the Bank's "adequately capitalized" status is apparent from the 2008 PPM, which states that the Bank is "adequately capitalized."  Yet the Fraud Defendants were aware that the Bank continued to accept brokered deposits in violation of FDIC regulations, without disclosing that material fact to investors.

114.    The Fraud Defendants were also motivated to hide the true financial position of Haven Trust in order to preserve the substantial dividend stream that each received.  Haven Trust paid dividends of $.21/share in January and May 2008.  R.C. and Mukesh Patel each received over $28,000 from these dividends. The Bankruptcy Trustee concluded that at the time of these payments, Haven Trust was insolvent, and is seeking the return of these payments from all shareholders who received these dividends.

## COUNT IV

## AGAINST THE FRAUD DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

115.    This count is brought on behalf of the Class pursuant to § 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 promulgated thereunder against the Fraud Defendants.

116.    During the Class Period, the Fraud Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged herein regarding the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices; and (ii) caused Plaintiffs and other Class Members to purchase Haven

56

Trust stock at artificially inflated prices, as set forth above.  In furtherance of this unlawful scheme, plan and course of conduct, the Fraud Defendants, and each of them, took the actions set forth herein.

117.   The Fraud Defendants (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Haven Trust's stock in an effort to maintain artificially high market prices for those securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Fraud Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

118.   The Fraud Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices as specified herein.

119.   The Fraud Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to

57

conceal the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Haven Trust stock during the Class Period.

120.   The Fraud Defendants' primary liability arises from the following facts:  (i) the Fraud Defendants were directors and/or officers of Haven Trust and the Bank during the Class Period; (ii) each of these Defendants, by virtue of his responsibilities and activities as a director and/or officer of the Company and the Bank, was privy to and participated in the creation, development and reporting of Haven Trust's plans, statements and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to members of the Bank's management team, examinations, internal reports and other data and information about the Haven Trust's operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew recklessly disregarded omitted material facts.

121.   The Fraud Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were

available to them.  Such material omissions were done knowingly or recklessly and for the purpose and effect of concealing the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices from the investing public and supporting the artificially inflated price of Haven Trust's securities.

122.   As a result of the failure to disclose material facts, as set forth above, the price of Haven Trust stock was artificially inflated during the Class Period.

123.   At the time of said omissions, Plaintiffs and other Class Members were ignorant of the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those and other practices of the Bank. Had Plaintiffs and the other Class Members known the truth, Plaintiffs and other Class Members would not have purchased or otherwise acquired their Haven Trust stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

124.   By virtue of the foregoing, the Fraud Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5.

125.   As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiffs and the other Class Members suffered damages in connection with their respective purchases of Haven Trust's stock during the Class Period.

## COUNT V

## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

126.   This count is brought on behalf of the Class pursuant to § 20(a) of the Exchange Act.

127.   Defendants acted as controlling persons of Haven Trust and the Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with Haven Trust and participation in and/or awareness of the Company's operations, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  Defendants were provided with or had access to information about the Bank's excessively risky lending practices and material facts raised by regulatory authorities regarding those practices, and copies of the Company's PPM's and other statements alleged by Plaintiffs to contain omissions prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60

128.   In particular, Defendants had direct and supervisory involvement in Haven Trust and the Bank's day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129.   As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Haven Trust and the Bank, all of the Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and other Class Members suffered damages in connection with their purchases of the Haven Trust's stock during the Class Period.

## COUNT VI

## AGAINST ALL DEENDANTS FOR VIOLATIONS OF THE GEORGIA SECURITIES ACT OF 1973

130.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131.   This Count is brought on behalf of the Subclass against all Defendants to enforce liability created by O.C.G.A. §§ 10-5-12 and 10-5-14 the Georgia Securities Act of 1973.

132.   The Fraud Defendants offered to sell and sold securities to Subclass Plaintiffs herein.

133.   In connection with the offer to sell and the sale of these securities, the Fraud Defendants knew that they had made material omissions to members of the Subclass with the specific intent and purpose to effectuate a device and scheme and artifice to defraud each Class Member.

134.   In the alternative, the Fraud Defendants' acts were reckless and operated to deceive and defraud each member of the Subclass.

135.   Each Subclass Member was justified in reasonably relying upon the representation of the Fraud Defendants.

136.   The Fraud Defendants' course of conduct as described above operated as a fraud upon each Subclass Member.

137.   As a result of the Fraud Defendants' acts and omissions as described above, the Fraud Defendants obtained monies belonging to each Subclass Member by means of the omission of material facts necessary for Plaintiffs and other Class Members to make informed decisions with respect to the purchase of the securities.

138.   The Fraud Defendants have engaged in transactions, practices and courses of business, as described above, which operated to defraud and deceive each such Member as a purchaser of the securities.

139.   O.C.G.A. § 10-5-14(c) makes all Defendants each liable as a "control person" because each was an "executive officer or director" of Haven Trust at the time the material omissions occurred.

140.   As a result of the violations cited herein, each Subclass Member has suffered damages and is entitled to recover from the Fraud Defendants the consideration paid for their investments, plus lawful interest, reasonable attorney's fees and costs, and other damages as permitted by law.

## COUNT VII

### AGAINST ALL DEFENDANTS FOR PUNITIVE DAMAGES FOR VIOLATIONS OF THE GEORGIA SECURITIES ACT OF 1973

141.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

142.   This Count is brought on behalf of the Subclass against all Defendants for violations of the fraud provisions of Georgia law.

143.   The foregoing material omissions by the Fraud Defendants constitute fraud actionable at common law and under other provisions of Georgia law including, without limitation, O.C.G.A. §§ 51-6-1, 23-2-52, 23-2-53, 23-2-60, and 13-4-60.

144.   O.C.G.A. § 10-5-14(c) makes all Defendants each liable as a "control person" because each was an "executive officer or director" of Haven Trust at the time the material omissions occurred.

145.   Plaintiffs are also each entitled to recover separate punitive damages in amounts to be proved at trial.  The Fraud Defendants are jointly and severally liable for any and all amounts owing to each Subclass Member for each investment made by each such Class Member.

146.   This action is brought within the time permitted by law.

## COUNT VIII

## AGAINST THE FRAUD DEFENDANTS FOR VIOLATIONS OF GEORGIA STATUTORY FRAUD

147.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

148.   This Count is brought on behalf of the Class against the Fraud Defendants for violations of the fraud provisions of Georgia Law.

149.   The foregoing material omissions by the Fraud Defendants constitute fraud actionable at common law and under other provisions of Georgia law including, without limitation, O.C.G.A. §§ 51-6-1, 23-2-52, 23-2-53, 23-2-60, and 13-4-60.

64

150.   Plaintiffs and the other Class Members are also each entitled to recover separate punitive damages in amounts to be proved at trial.  The Fraud Defendants are jointly and severally liable for any and all amounts owing to each Class Member for each investment made by each Class Member.

151.   This action is brought within the time permitted by law.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class Counsel;

B.   Awarding compensatory, punitive and other damages to the full extent permitted by law in favor of Plaintiffs and the other Class and Subclass Members against the Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted, this 17th day of May, 2010.

**GORBY PETERS & ASSOCIATES, LLC**

/s/  Michael J. Gorby, Esq.
Michael J. Gorby, Esq.
mgorby@gorbypeters.com
(Georgia Bar No. 301950)
Jeffrey D. Cooper, Esq.
jcooper@gorbypeters.com
(Georgia Bar No. 478395)
Two Ravina Drive, Suite 1500
Atlanta, Georgia 30346-2106
Telephone:  (404) 239-1150
Fax:  (404) 239-1179

Lawrence J. Lederer
Robin Switzenbaum
Arthur Stock
Josh M. Rubens
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email: llederer@bm.net
          rswitzenbaum@bm.net
          astock@bm.net
          jrubens@bm.net

*Attorneys for Plaintiffs*

521298

66

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MUKTA PATEL, ASHOK PAREKH, | : | Case No.: 09-CV-3684-CAP |
| JITU PATEL, and ANDREA and PHIL | : | |
| BOSWELL, on Behalf of Themselves | : | CLASS ACTION |
| And All Others Similarly Situated | : | |
| | : | |
| Plaintiffs, | : | AMENDED COMPLAINT FOR |
| | : | VIOLATION OF THE FEDERAL |
| v. | : | SECURITIES LAWS |
| | : | |
| MUKESH C. PATEL, R.C. PATEL, | : | |
| EDWARD L. BRISCOE, SCOTT DIX, | : | |
| BRIJ M. KAPOOR, MUKUND R. | : | |
| PATEL, NARENDA D. PATEL, | : | |
| DHIRU G. PATEL, and BALVANT | : | |
| PATEL, | : | |
| Defendants. | : | |
| | : | DEMAND FOR JURY TRIAL |

## CERTIFICATION

Counsel hereby certify that the text of the accompanying document has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court, and complies in all respects with Local Rule 5.1(C) of the United States District Court, Northern District of Georgia.

Dated: May 17, 2010      Respectfully submitted,

**GORBY, PETERS & ASSOCIATES, LLC**
  /s/ Michael J. Gorby_____
Michael J. Gorby, Esq.
mgorby@gorbypeters.com
(Georgia Bar No. 301950)
Jeffrey D. Cooper, Esq.
jcooper@gorbypeters.com
(Georgia Bar No. 478395)
Two Ravinia Drive, Suite 1500
Atlanta, Georgia 30346-2104
Telephone: (404) 239-1150
Fax: (404) 239-1179
       - and -

**BERGER & MONTAGUE, P.C.**
/s/ Lawrence J. Lederer_____
Lawrence J. Lederer, Esq.
Robin Switzenbaum, Esq.
Arthur Stock, Esq.
Josh M. Rubens, Esq.
Admitted *Pro Hac Vice*
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
llederer@bm.net
rswitzenbaum@bm.net
astock@bm.net
jrubens@bm.net
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| MUKTA PATEL, ASHOK PAREKH, JITU PATEL, and ANDREA and PHIL BOSWELL, on Behalf of Themselves And All Others Similarly Situated | : : : : : | Case No.: 09-CV-3684-CAP CLASS ACTION |
| Plaintiffs, | : : | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL |
| v. | : : | SECURITIES LAWS |
| MUKESH C. PATEL, R.C. PATEL, EDWARD L. BRISCOE, SCOTT DIX, BRIJ M. KAPOOR, MUKUND R. PATEL, NARENDA D. PATEL, DHIRU G. PATEL, and BALVANT PATEL, | : : : : : : : | |
| Defendants. | : : | DEMAND FOR JURY TRIAL |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties in the foregoing matter with a copy of **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of Clerk using the CM/ECF system which will automatically send email notification of such filing to the following counsel of record:

Robert R. Long, Esq.
Kerry Vatzakas, Esq.
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
(404) 881-4760
(404) 253-8260 Fax
*Attorneys for Defendants*

Dated: May 17, 2010          Respectfully submitted,

**GORBY, PETERS & ASSOCIATES, LLC**
   __/s/ Michael J. Gorby_____
Michael J. Gorby, Esq.
mgorby@gorbypeters.com
(Georgia Bar No. 301950)
Jeffrey D. Cooper, Esq.
jcooper@gorbypeters.com
(Georgia Bar No. 478395)
Two Ravinia Drive, Suite 1500
Atlanta, Georgia 30346-2104
Telephone: (404) 239-1150
Fax: (404) 239-1179
          - and -

**BERGER & MONTAGUE, P.C.**
Lawrence J. Lederer, Esq.
Robin Switzenbaum, Esq.
Arthur Stock, Esq.
Josh M. Rubens, Esq.
Admitted *Pro Hac Vice*
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
llederer@bm.net
rswitzenbaum@bm.net
astock@bm.net
jrubens@bm.net
*Attorneys for Plaintiffs*